Randall D. PETERS, Personal Representative of the Estate of Constance Marie Peters, Deceased, Respondent,

v.

GENERAL MOTORS CORPORATION; Appellant

Moffett's Auto Works, Inc., Defendant.

No. WD 62807.

Missouri Court of Appeals, Western District.

Jan. 17, 2006.

Application for Transfer to Supreme Court Denied Feb. 28, 2006.

Application for Transfer Sustained May 2, 2006.

Case Retransferred Sept. 26, 2006.

Court of Appeals Opinion Readopted Oct. 2, 2006.

Turner, Reid, Duncan, Loomer & Patton, P.C., Rodney E. Loomer, Elizabeth D. Badger and Nancy Dixon, Kansas City, Wallace S. Squibb, Springfield, Bryan Cave LLP, Ann K. Covington, James F. Bennett, St. Louis, Bingham McCutchen LLP, Frank M. Hinman, Thomas S. Hixson, Lee G. Sullivan, Renee M. DuPree, San Francisco, CA, for appellant.

Mark J. Evans and Bradley D. Kuhlman, Evans & Kuhlman, Kansas City, Michael W. Blanton, Lee's Summit, Edward D. Robertson, Bartimus, Frickleton, Robertson & Obetz, Jefferson City, Mary D. Winter, Anthony L. Dewitt, Jefferson City, Robert L. Langdon, James K. Emison, Kevin D. Stanley and Robert C. Sullivan, Lexington, for respondent.

Before VICTOR HOWARD, P.J., HAROLD L. LOWENSTEIN, ROBERT G. ULRICH, PAUL M. SPINDEN, JAMES M. SMART, THOMAS H. NEWTON, RONALD R. HOLLIGER, LISA WHITE HARDWICK, J.J., FOREST HANNA, GENE MARTIN, and JOHN MORAN, Sr. J.J.[1]

1. Chief Judge Edwin Smith and Judges Patricia Breckenridge and Joseph M. Ellis recused themselves.

ROBERT G. ULRICH, Judge.

General Motors Corporation (GM) appeals from the judgment for Respondent, Randall Peters, in his individual capacity for his claim of loss of consortium and as next friend for his wife, Constance Peters, on her products liability claims for damages, actual and punitive, as a result of an accident involving the Peters' GM manufactured 1993 Oldsmobile Cutlass (the Cutlass), which left Mrs. Peters in a persistent vegetative state. Mr. Peters filed a four-count petition seeking damages for Mrs. Peters' personal injuries and his loss of consortium, alleging three separate theories of liability: (1) strict products liability—defective design; (2) strict products liability—failure to warn; and (3) negligence. The claims asserted that the cruise control located on the Peters' vehicle was defectively designed and dangerous, that GM knew it was dangerous and failed to warn, and that it caused Mrs. Peters' injuries. Mr. Peters presented expert testimony to prove defective design. Because no witnesses could be found of the accident, he also relied on circumstantial evidence to deduce that Mrs. Peters did not errantly apply the accelerator pedal and that the cruise control device on the vehicle malfunctioned and caused the accident.

GM responded that the three-mode cruise control system was not defectively designed, but even if it were, absolutely no evidence was presented to prove that the Cutlass' cruise control malfunctioned to cause the Cutlass to accelerate, as post accident inspections undisputedly showed that the system appeared to be working properly, and no residual evidence existed that demonstrated the mechanism had malfunctioned. According to GM, because no evidence was presented, direct or circumstantial, that suggested any sort of malfunction in the Cutlass, the likely cause of Mrs. Peters' accident was her inadvertent application of the accelerator pedal.

At the close of Mr. Peters' evidence, and again at the close of all the evidence, GM moved for directed verdict. The trial court, however, denied both motions. All three theories of liability alleged by Mr. Peters were submitted to the jury: (1) products liability—defective design; (2) products liability—failure to warn; and (3) negligence, and the jury returned its verdict, awarding $20,000,000 in compensatory damages on behalf of Mrs. Peters and $10,000,000 in compensatory damages to Mr. Peters' in his individual capacity and assessing GM $50,000,000 in punitive damages. The trial court accepted the jury's verdict and entered judgment thereon. On February 6, 2003, GM filed its motion for JNOV; and alternatively for a new trial, remittitur, and to amend the judgment, which the trial court subsequently denied. This appeal followed.

GM asserts ten points on appeal. In Points I and II, it claims that the trial court erred in overruling its motion for directed verdict at the close of all the evidence because the evidence presented was insufficient to present a submissible case as to all three theories of liability submitted to the jury. In Points III and IV, GM claims that the trial court erred in admitting certain evidence at trial; while in Point V, it claims that the trial court erred in excluding certain evidence it sought to introduce at trial. In Points VI–X, GM advocates several claims concerning the damages awarded, which include a challenge to the sufficiency of the evidence to support an award of punitive damages, and alternative assertions for remitter.

## FACTUAL AND PROCEDURAL HISTORY

On the morning of September 6, 2000, Mrs. Peters was involved in a single vehi-

cle accident as the Peters' 1993, eight-year-old GM manufactured Cutlass automobile traveled 118 feet in reverse from the driveway of the Peters' residence across the street to the front of the house, sideswiped a tree in the neighbor's front yard while traveling about 22–25 miles per hour, and continued to travel in reverse back across the street for 95 feet into the Peters' front yard where the two left tires scaled a yard landscape timber slightly less than a foot high, and where the vehicle ultimately stopped with only the left front tire over the timber. Mr. Peters heard a noise and immediately exited the family residence, observed the vehicle and his wife, called 911, and attempted to comfort her. She was lying unconscious with her upper torso across the front passenger seat. The engine of the vehicle was idling.

GM does not contest that Mrs. Peters sustained severe injuries when the vehicle sideswiped the neighbor's tree or that she was rendered unconscious when that occurred.[2] Mrs. Peters suffered seven cranial fractures and severe brain injury, and her left arm was amputated at the forearm. Her brain injuries left her in a persistent vegetative state.

No witnesses observed the accident or the events that immediately followed before Mr. Peters observed the vehicle with the left front wheel in the planter in his front yard. The vehicle was parked in the driveway near the garage door overnight, and Mrs. Peters' apparent intent was to exit the driveway to enter the street in front of the Peters' residence and proceed to her employment as a schoolteacher.

After the event, the parties employed experts to inspect the Cutlass. The Cutlass appeared to be in proper working order. No physical evidence was discovered of any sort of mechanical or electrical malfunction, including the cruise control mechanism. The vehicle had been driven 75,000 miles without cruise control incident or malfunction.

On March 5, 2001, Mr. Peters filed his four-count petition seeking damages for Mrs. Peters' injuries and his loss of consortium. In Count I, he sought recovery on Mrs. Peters' behalf against GM on a strict products liability theory as authorized by section 537.760,[3] alleging, inter alia, that: (1) the cruise control system installed in the Cutlass was defectively designed in that it had a propensity to cause sudden and unwanted acceleration, and (2) GM failed to warn of the resulting danger. In Count II, again on Mrs. Peters' behalf, he sought recovery against GM on a negligence theory, alleging, inter alia, that GM breached the duty of care owed to Mrs. Peters by: (1) designing a defective and dangerous cruise control system, which was installed in the Cutlass; and (2) failing to warn of the resulting danger. In Count III, which was dismissed before trial as a result of a settlement agreement, Mr. Peters sought recovery against Moffett's Auto Works, an auto shop that had performed repair work on the Cutlass' electrical system. And, in Count IV, Mr. Peters asserted his loss of consortium predicated by Mrs. Peters' injuries as pled in Counts I and II.

No witnesses observed the vehicle traverse any part of the journey, and circumstantial evidence was presented to prove

2. The occurrence of the vehicle's sideswiping the tree is occasionally referred to as "the accident," distinguishing the events that immediately followed when the Peters' vehicle "spun off" the tree and traveled in reverse to the Peters' front yard where it stopped with

the left front wheel astride the log planter about a foot high.

3. All statutory references are to RSMo 2000 unless otherwise indicated.

that the cruise control mechanism malfunctioned and caused the accident. GM conceded during the trial on at least four occasions that the vehicle's acceleration and Mrs. Peters' injuries were caused by one of two options: (1) the accelerator pedal was applied by Mrs. Peters (referred to during trial as pedal error) or by an object pressed against it (referred to as pedal misapplication during trial), or (2) the cruise control on the vehicle malfunctioned resulting in its activation without driver input and the car's acceleration. Mr. Peters' opening statement to the jury included, "Was it Connie Peters' foot or was it the cruise control that caused the accident? It was either her foot . . . or it was the cruise control."

### GM'S CLAIMED ERRORS

Points III and IV regarding the admissibility of certain evidence introduced by Mr. Peters at trial are first considered because their resolution has some bearing on Points I and II. Therefore, Points III and IV are addressed before GM's challenge to the sufficiency of the evidence as to all three theories of liability submitted to the jury, expressed in Points I and II, is considered. Point V regarding the exclusion of certain evidence is discussed next. Finally, Point VII regarding the sufficiency of the evidence to submit punitive damages is discussed.

### I. Introduction of testimony of seven witnesses of other similar incidents as evidence of defective design and customer complaints as evidence of notice of dangerous instrumentality

In Point IV, GM claims that the trial court erred in allowing a total of seven witnesses to testify about their experiences of sudden unwanted vehicular acceleration while driving a 1988 to 1993 GM-made vehicle equipped with cruise control and in

permitting the admission of reports of complaints made to GM (called 1241 Reports) where the complainant alleged that the GM manufactured vehicle then driven manifested sudden unwanted vehicle acceleration without driver input. Mr. Peters offered the testimony of the seven witnesses as evidence of defective design. He offered the reports of complaints as evidence that GM had notice of the defectively designed cruise control and that the design was dangerous.

### A. Standard of Review

The decision of the trial court to admit or exclude evidence is reviewed for an abuse of its discretion. *Romeo v. Jones,* 144 S.W.3d 324, 332 (Mo.App. E.D.2004). "The trial court abuses its discretion when its ruling is clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary that the ruling shocks the sense of justice and indicates a lack of careful deliberate consideration." *Nelson v. Waxman,* 9 S.W.3d 601, 603 (Mo. banc 2000). The trial court's evidentiary ruling will be affirmed unless there is a substantial or glaring injustice. *Romeo,* 144 S.W.3d at 332. To reverse, the trial court's erroneous admission or exclusion of evidence must have been prejudicial and materially affected the merits of the action. *Id.*

In products liability cases, "evidence of other accidents may be relevant (1) to prove the existence of a particular physical condition or defect, (2) to show that the defect or dangerous situation caused the injury, (3) to show the risk that defendant's conduct created, and (4) to prove that defendant had notice of the danger." *Govreau v. Nu–Way Concrete Forms, Inc.,* 73 S.W.3d 737, 741–42 (Mo. App. E.D.2002). In products liability cases, evidence of an accident similar in nature to that which injured the plaintiff is

admissible provided the evidence is relevant and sufficiently similar to the injury-causing accident so as to outweigh concerns of undue prejudice and confusion of the issues. *Thornton v. Gray Auto. Parts Co.,* 62 S.W.3d 575, 583 (Mo.App. W.D.2001)(citing *Newman v. Ford Motor Co.,* 975 S.W.2d 147, 151 (Mo. banc 1998)). To be sufficiently similar, each occurrence must: (1) be of like character; (2) occur under substantially the same circumstances; and (3) result from the same cause as that alleged to have caused the accident in question. *Lopez v. Three Rivers Elec. Co-op. Inc.,* 26 S.W.3d 151, 159 (Mo. banc 2000); *Gerow v. Mitch Crawford Holiday Motors,* 987 S.W.2d 359, 364–65 (Mo.App. W.D.1999).

### B. Testimony of seven witnesses claiming unwanted vehicle acceleration

■ Mr. Peters presented the testimony of seven individuals who were driving GM vehicles manufactured between 1988 and 1993 when they experienced unwanted sudden acceleration as proof of defective design. The vehicles driven by the witnesses were equipped with three mode cruise control devices just as was the Peters' vehicle. The seven witnesses testified to having experienced one or more unwanted sudden acceleration incidents in the early 1990s while driving their GM made vehicles. Each witness testified that the vehicle he or she was driving suddenly accelerated when, while the vehicle was stopped, the transmission was placed in the reverse position. Each testified that he or she did not inadvertently press the accelerator pedal to cause the vehicle's sudden acceleration, and all except one testified that the vehicle continued to proceed despite application of the brake pedal.

The witness who did not apply the braked pedal testified that he did not have time to apply it before the vehicle struck another vehicle and stopped. All but one testified that a GM representative or GM dealership examined the vehicle post occurrence, and each was told that the investigation revealed no evidence that any sort of mechanical or electrical malfunction had occurred. One witness admitted that she had informed the GM investigator of previous floor-mat problems and that a warped floor-mat pressing the accelerator pedal might have caused the sudden acceleration that she experienced.

The testimonies of seven witnesses were presented as evidence that the Cutlass' cruise control was defectively designed—"a particular physical condition or defect." *Govreau,* 73 S.W.3d at 741–42. GM argues that these incidents were not sufficiently similar to Mrs. Peters' accident to permit their admission as evidence. GM claims that Mr. Peters failed to show that the sudden acceleration the witnesses experienced while driving GM vehicles was sufficiently similar to Mrs. Peters' event in that none were shown to have resulted from a defectively designed cruise control as Plaintiff's petition alleged Mrs. Peters experienced. GM claims the trial court erred in allowing the witnesses to testify about other incidents of sudden unwanted acceleration because "[n]othing proved a defective cruise control-much less a transient charge-caused any of those incidents." Mr. Peters acknowledged that no evidence showed cruise control malfunction in any of the seven incidents. Mr. Peters asserts, however, that evidence that a defective cruise control caused the sudden acceleration is not required, and each witness' testimony was admissible because each incident involved a sudden acceleration of a vehicle that was not the result of driver input. Mr. Peters' rationale is that where accelerator pedal application is eliminated as a possible cause of the sudden vehicle acceleration, and where a post

accident inspection reveals no evidence indicating mechanical or electrical malfunction, the only remaining possible cause of the vehicle's acceleration is cruise control malfunction despite the absence of physical evidence that it malfunctioned. Mr. Peters' selection of similar incidents are those incidents where "pedal misapplication as a cause is eliminated, leaving only a cruise control malfunction to explain the sudden acceleration." Thus, Mr. Peters' position is that the trial court could have properly admitted evidence concerning any sudden acceleration incident of a GM vehicle with a cruise control like that on the Peters' vehicle so long as the driver testified that he or she did not press the accelerator pedal and post accident inspection of the vehicle did not show evidence that a mechanical or electrical malfunction had occurred.

Mr. Peters' contention is erroneous. His claim is that the GM manufactured Cutlass accelerated to cause the accident and Mrs. Peters' injuries because the cruise control system on the vehicle was defectively designed and malfunctioned. Evidence was presented that sudden and unexpected acceleration can have multiple causes in addition to cruise control malfunction and pedal error. Evidence that the vehicles driven by the seven witnesses accelerated without operator activation of the accelerator pedal was not sufficient, without more, to warrant admission of their occurrences in this case as other similar incidents to demonstrate defective design. Mr. Peters and GM agreed that in *this* case the acceleration experienced by Mrs. Peters occurred because of either accelerator pedal application or cruise control malfunction. The parties did not so stipulate as to the seven other incidents. No expert testimony was presented that the sudden unwanted acceleration could have been caused only by a defective cruise control or application of the acceler-

ator pedal. And one can not reasonably infer without expert testimony that the only possible cause for sudden acceleration experienced by the seven witnesses was cruise control malfunction simply because the witnesses testified that they did not accidentally apply the accelerator pedal and the post incident vehicle investigations revealed no mechanical or electrical malfunction. Their testimonies, with the possible exception of one witness who indicated that a mat might have applied pressure to the accelerator pedal, were simply that they experienced unwanted sudden acceleration without applying pressure to the accelerator pedal.

Furthermore, in all but one of the seven incidents, the witnesses testified that they applied the brake pedal, but the vehicle continued to accelerate. Samuel Sero, an electrical engineer and Mr. Peters' expert witness, testified that the cruise control in the Peters' vehicle was defective and that it caused the accident. He also testified that a cruise control system, even if defectively designed, will not function when the brake pedal is applied. Mr. Sero's unrebutted expert testimony was that applying the break pedal would have disengaged a malfunctioning cruise control in about two-tenths of a second, causing the engine to immediately "go to idle." He also testified that if Mrs. Peters pressed the brake pedal, his theory of a defectively designed cruise control as the cause of the accident would not be correct.

Mr. Sero's unrebutted expert testimony conflicts with the evidence of the seven witnesses, offered to show defective design, where each of the drivers, except for one, applied the brake pedal of the vehicle then driven, but the vehicle did not cease accelerating. Thus, the evidence, according to Mr. Sero's testimony, was that the cruise control on these vehicles could not have then been malfunctioning because pressing the brake pedal would have disen-

gaged a malfunctioning cruise control. No evidence conflicted with Mr. Sero's statement. Six of the seven witnesses claimed that they applied the brake pedal, some "as hard as [they] could, all the way to the floor," but the engine continued to "rev" and the car did not stop. This occurrence is obviously dissimilar to that experienced by Mrs. Peters. Mr. Peters' evidence suggests that Mrs. Peters never pressed the brake pedal at any time during the incident. Mr. Sero testified that had Mrs. Peters applied the brakes of her vehicle, the cruise control on the vehicle, even if it were engaged as a result of malfunctioning, would have disengaged. The testimonies of the seven witnesses could not demonstrate that the cruise control on the Peters' Cutlass was defectively designed. Without evidence in some form that the cruise control systems on the vehicles driven by the seven witnesses was defective and caused the unwanted sudden acceleration of the vehicle, the trial court could not reasonably conclude that these incidents of vehicular acceleration resulted from the same cause that Mr. Peters asserted, a requirement for showing sufficient similarity. *Lopez*, 26 S.W.3d at 159.

The trial court abused its discretion in allowing the seven witnesses to testify about their incidents of sudden acceleration. Because the other incidents were not shown to have been caused by a defective cruise control, they were not sufficiently similar to the accident in this case, and GM was unduly prejudiced when the testimony was offered as proof of defective design. The point is granted. Furthermore, the witnesses' testimonies are excluded in determining whether the evidence presented was sufficient to make a submissible case.

### C. Reports of complaints made to GM (called 1241 Reports)

■ GM asserts that the trial court erred in admitting reports of complaints made to GM of other claimed sudden acceleration incidents involving GM manufactured automobiles. The reports were admitted as evidence that GM had notice that the cruise control mechanism on the Peters' vehicle was defectively designed and dangerous—GM "had notice of the danger." *Govreau*, 73 S.W.3d at 741–42. GM objected to their admission before trial, before their admission during trial, and in its post trial motions, all of which were denied.

Jerry Wallingford, Mr. Peters' accident reconstructionist, testified about the reports of complaints. He selected the reports from 413 produced by GM and discussed them. His criteria for selecting the incidents reported to GM were (1) whether the person reporting the incident reported that the vehicle manifested sudden or uncontrolled acceleration without driver input, (2) whether the acceleration occurred when the vehicle was stopped and the transmission was placed from park to drive or reverse, and (3) whether any mechanical or electrical problems were identified as causal factors. He referenced 213 reports of complaints that matched the criteria. Of the 213 complaints, only seventy-four of the vehicles referenced were known to have cruise control.

■ Because the reports of complaints were admitted to show that GM had notice of the defective cruise control and not defective design, the court gave a limiting instruction that stated:

> Customer complaints of sudden acceleration made to GM and documented on Form 1241s are being introduced and should be considered by you as to notice to GM regarding these complaints. They should not be considered by you as evidence of any defect in the vehicle in

question in this case.[4]

As previously noted, evidence of prior incidents is admissible "if the evidence is of an accident of like character that occurred under substantially the same circumstances and resulted from the same cause." *Lopez*, 26 S.W.3d at 159. The degree of similarity required for evidence that constitutes notice to defendant of prior similar accidents is less demanding than the similarity required to show that the same accident occurred on the occasion in issue, but "the previous injury or injuries [must] be such as to call defendant's attention to the dangerous situation that resulted in the litigated accident." *Stacy v. Truman Med. Ctr.*, 836 S.W.2d 911, 926 (Mo. banc 1992)(quoting CHARLES MCCORMICK, MCCORMICK ON EVIDENCE, § 200 at 708 (John Strong ed., 4th ed.1992)).

The criteria for selecting the incidents were flawed for application to this case where Mr. Peters alleged the cause of the accident was a defectively designed and malfunctioning cruise control device. Mr. Wallingford agreed during his testimony that where a vehicle was not equipped with cruise control, a sudden acceleration of the vehicle without driver input is not a substantially similar incident to the Peters' incident. Of the 213 incidents, only 74 vehicles were reported to have been equipped with cruise control. Because the pleadings in this case alleged that the accident was caused by a malfunctioning cruise control, the "dangerous situation that resulted in the litigated accident," at least one criterion for selecting similar incidents must have been that the vehicle involved was equipped with cruise control. Whether the reported incidents involved vehicles equipped with GM cruise control devices is a significant criterion for determining whether GM had notice that the GM installed cruise control mechanism located on the Peters' vehicle was defectively designed and dangerous as alleged by Mr. Peters, or that it may have been, warranting due inspection. While admitting the 74 reports involving vehicles with cruise control may have been appropriate, the 139 remaining complaints that did not indicate that the vehicle involved was equipped with cruise control did not report incidents sufficiently similar to the accident in this case.[5] Those 139 reports were evidence that something may be wrong with the vehicles reported, but the criteria used to select them were not sufficiently restrictive "to call [GM's] attention to the dangerous condition that resulted in the litigated accident." *Id.* The trial court, thus, abused its discretion in permitting their admission to the undue prejudice of GM. The point is granted as to the 139 referenced reports. To the extent that the 139 reports were inadmissible, they will not be considered in determining whether Mr. Peters' made a submissible case.

4. Despite the limiting instruction, Mr. Peters' counsel argued in closing argument that the jury should consider the reports as evidence that a defective cruise control caused Mrs. Peters' accident and her injuries. Counsel stated that Mr. Sero did not have "all the answers," but for the jury to consider the "[t]wo hundred-plus times it's happened." "And that's proof of what happened to Connie Peters that morning. What better proof is there about what happened that morning and what happens with this vehicle than what has happened to other people in the same vehicle? That's some of the best proof we have."

5. In the retrial, if Mr. Peters can demonstrate as an additional criterion that any of the 139 reports was about a vehicle that had a cruise control device, the report about that vehicle may satisfy the criteria for admission for the limited purpose of showing that GM had notice of the possibility that the cruise control device may have been defectively designed and dangerously prone to malfunction, warranting due inspection.

## II. Admission of Samuel Sero's testimony as an expert witness

In Point III, GM claims that the trial court erred in allowing Mr. Peters' expert witness, Samuel Sero, to testify about his single transient fault theory as the basis for his opinion that the cruise control on the Peters' Cutlass was defectively designed and that it malfunctioned and caused Mrs. Peters' accident. GM asserts that Mr. Sero's theory was premised upon facts or data not reasonably relied upon by experts in the automotive electrical engineering field to form opinions or inferences upon the subject, which is required by section 490.065 governing admission of expert witness opinion testimony. Thus, GM claims that Mr. Sero's testimony expressing his single transient fault theory as the basis for the three-mode cruise control's defective design did not satisfy section 490.065 requirements for admissibility.

Mr. Peters relied on electrical engineer Samuel Sero's expert testimony to fault the design of the three-mode cruise control located on the Peters' vehicle. Mr. Sero testified by videotape deposition. He expressed that the accident was not "an operator created incident," that the cruise control mechanism that was located on the Peters' vehicle was defectively designed and dangerous, and that a single transient fault actuated the throttle of the Peters' vehicle and caused the accident. He explained that intermittent and short lived transient charges emanate from the numerous electrical devices located on every motor vehicle, which Mr. Sero stated have the potential to travel through electrical pathways to access points located on other electrical devices and to enter them. The pathways exist, Mr. Sero explained, because the same power source and terminal ground are used to operate the many elec-

trical devices located on motor vehicles. The automotive manufacturing industry recognizes that transient charges occur and attempts to protect electrical devices from them by using resistors. Resistors are protective devices that are used to resist and control the flow of current, and sometimes, to dissipate heat. Resistors are used to protect cruise control devices from transient charges.

Mr. Sero testified to his theory that a transient or intermittent electrical signal is capable of causing a cruise control module to function when it should not. He explained that an electrical charge that emanates from within a vehicle's electrical system but from outside the cruise control module and enters the cruise control through pathways to access points on the device is called "a fault." Mr. Sero examined the cruise control located on the Peters' vehicle after the September 16, 2000, event. He acknowledged that, after examining the device, he had said the absence of four resistors to protect the cruise control from transient signals constituted the design defect that made the cruise control dangerous. Mr. Sero learned later that, contrary to his original belief, resistors were located on the circuit board in what he called "a resistive array." He then criticized these resisters as not being true resistors, calling them "resistor chips." These resistors are made in the same manner as integrated circuit chips with wafered layers of a crystalline type material. They were not equivalent to resistors as protection against transient charges, Mr. Sero opined, effectively saying that they constituted the design defect that permitted a transient fault to enter the device resulting in its unwanted activation and the resultant acceleration of the Peters' vehicle. He stated that if resistors had been present on the device instead of "resistor chips," the single transient fault that he believes caused the vehicle to accelerate

and the resultant accident would not have occurred, and the cruise control on the Peters' vehicle would have been a reasonably safe and appropriate design. Mr. Sero added that the design of the three-mode cruise control, which was the type of cruise control on the Peters' Cutlass, is particularly susceptible to a single transient electrical fault malfunction, and, therefore, GM should have ceased installing the three-mode cruise control system in its manufactured vehicles and instead should have begun installing a stepper-motor cruise control system before it did in 1994.

Mr. Sero opined that, in addition to the cruise control design on the Cutlass being defective, potentially permitting a transient electrical charge to pass through it and actuate the vehicle's throttle, Mrs. Peters' accident was caused by the defectively designed cruise control. He based his opinion on: (1) Accident Reconstructionist Jerry Wallingford's determination that the Cutlass experienced mechanical acceleration from the tree to the Peters' front yard after its collision with the tree; (2) the opinion of Mrs. Peters' treating neurologist, Dr. Geoffrey Blatt, that Mrs. Peters could not have consciously pressed the vehicle's accelerator pedal after the collision with the tree because she was then unconscious; (3) his own inspection of the Cutlass in anticipation of trial, which revealed to him that warped floor-mats did not cause the Cutlass to suddenly accelerate after colliding with the tree; and (4) the absence of evidence establishing a mechanical or electrical malfunction in the cruise control or any other device installed in the Cutlass. As a result of these four considerations, Mr. Sero concluded that the cruise control must have caused the Cutlass to suddenly accelerate after colliding with the tree because he eliminated as possible causes "pedal error" (human error) and "pedal misapplication," which he equated to warped floor-mats or other objects applying pressure to the accelerator.

In this case, no witnesses testified about what occurred immediately before the vehicle struck the tree, or immediately after the accident before the vehicle stopped on the Peters' lawn. Mr. Sero relied instead on the opinion testimonies of Mr. Wallingford and Dr. Blatt to provide the basis for his own opinion that the Peters' vehicle accelerated post accident. And, he concluded, because no physical evidence existed to establish that the Cutlass malfunctioned, causing it to accelerate, the only remaining possibility for the vehicle's acceleration was that a single transient electrical fault entered the Cutlass' cruise control module causing it to activate, resulting in the vehicle's sudden acceleration and the accident, and leaving no physical evidence that the device otherwise malfunctioned.

■ GM filed numerous pre-trial motions, including a motion in limine challenging Mr. Sero's testimony. The motion was denied. The record discloses that GM's objection to Mr. Sero's testimony was not reasserted at trial as were other renewed objections first raised pre-trial as motions in limine. Rulings on motions in limine are interlocutory and subject to change during the course of the trial. *Hancock v. Shook*, 100 S.W.3d 786, 802 (Mo. banc 2003). "A motion in limine, by itself, preserves nothing for appeal." *Id.* To preserve an evidentiary issue on appeal, a party is required to object at trial to the introduction of the evidence and to reassert the objection in post trial motions. *State v. Hayes*, 169 S.W.3d 613, 624 (Mo. App. S.D.2005). Mr. Peters presented Mr. Sero's deposition testimony at trial without objection as evidence that the cruise control on the Peters' vehicle was defectively designed, permitting the device to mal-

function, and that the cruise control malfunctioned to cause Ms. Peters' injuries. GM asserted specific objections to portions of Mr. Sero's testimony, which were overruled, and which are not asserted as error on appeal. But GM failed to preserve the issue of whether Mr. Sero's opinion testimony that the cruise control on the Peters' vehicle was defectively designed and prone to permit a single transient or intermittent electrical charge to enter the device and cause it to activate the vehicle's throttle without driver input satisfied the standard of section 490.065 for admission. GM's failure to assert its objection to Mr. Sero's testimony at trial waived the objection, and its post trial motion raising the issue was not sufficient to preserve the issue for review without proper objection at trial. The point is denied.

## III. Sufficiency of the Evidence

In Points I and II, GM claims that the trial court erred in submitting Mr. Peters' strict liability and negligence claims for design defect and failure to warn and in denying its motions for directed verdict at the close of all the evidence because the evidence presented by Mr. Peters was insufficient to make a submissible case as to all three theories of liability submitted to the jury. Specifically, GM claims that Mr. Peters failed to present sufficient evidence from which a reasonable juror could have inferred that the cruise control system installed in the Cutlass was defectively designed and dangerous and that GM failed to warn of its condition. Alternatively, GM argues that not only did Mr. Peters fail to present substantial evidence of a defectively designed cruise control, he also failed to present sufficient evidence from which a reasonable juror could have inferred that a defectively designed cruise control caused the Cutlass to suddenly accelerate.

## A. Standard of Review

The standard of review for a trial court's denial of a motion for directed verdict is whether the plaintiff has made a submissible case. *Brown v. Hamilton Ins. Co.*, 956 S.W.2d 417, 419 (Mo.App. E.D.1997). Appellate authority reviews all the evidence and reasonable inferences therefrom in a light most favorable to the jury's verdict, disregarding evidence to the contrary. *Seitz v. Lemay Bank & Trust Co.*, 959 S.W.2d 458, 461 (Mo. banc 1998). Missing evidence is not supplied, and the plaintiff is not granted unreasonable, speculative, or forced inferences. *Steward v. Goetz*, 945 S.W.2d 520, 528 (Mo.App. E.D.1997). "The evidence and inferences must establish every element and not leave any issue to speculation." *Id.* (citation omitted).

In Missouri, products liability claims are governed by section 537.760, which reads:

As used in sections 537.760 to 537.765, the term "products liability claim" means a claim or portion of a claim in which the plaintiff seeks relief in the form of damages on a theory that the defendant is strictly liable for such damages because:

(1) The defendant, wherever situated in the chain of commerce, transferred a product in the course of his business; and

(2) The product was used in a manner reasonably anticipated; and

(3) Either or both of the following:

(a) The product was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use, and the plaintiff was damaged as a direct result of such defective condition as existed when the product was sold; or

(b) The product was then unreasonably dangerous when put to a reasonably

anticipated use without knowledge of its characteristics, and the plaintiff was damaged as a direct result of the product being sold without an adequate warning.

Section 537.760(3)(a) has been interpreted to allow claims on two separate theories, design defect and manufacturing defect. *See Richcreek v. Gen. Motors Corp.,* 908 S.W.2d 772, 775–76 (Mo.App. W.D.1995)(explaining that a design defect claim differs from a manufacturing defect claim in that a defectively designed product is sold in the condition intended by the manufacturer, while a defectively manufactured product is not). Thus, section 537.760 articulates three separate theories of liability under the general umbrella of products liability: (1) design defect, (2) manufacturing defect, and (3) failure to warn. A plaintiff may also file a negligence or warranty claim together with a section 537.760 claim. *See Blevins v. Cushman Motors,* 551 S.W.2d 602, 607–08 (Mo. banc 1977)(explaining that a negligence claim differs from a products liability claim in that the focus in a negligence claim is the defendant's conduct, whereas the focus in a products liability claim is the product itself). Thus, one who sells a "product in a defective condition unreasonably dangerous to the user or consumer ... is subject to liability" for injury to the user or the user's property caused by the defect. *Keener v. Dayton Elec. Mfg. Co.,* 445 S.W.2d 362, 364 (Mo.1969). To prevail under the doctrine of strict liability in tort, the plaintiff must prove that the product was defective and dangerous when put to a reasonable use anticipated by the manufacturer and that the plaintiff sustained damage as a direct result of the defect. *Blevins,* 551 S.W.2d at 607.

### B. Theories presented to the jury

Mr. Peters alleged, and the jury was instructed upon, three separate theories of liability: (1) products liability—design defect; (2) products liability—failure to warn; and (3) negligence. The jury was instructed on the design defect claim that to find for the plaintiff it had to find that the "cruise control system on the 1993 Oldsmobile Cutlass Supreme owned by Constance Peters was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use." The jury was instructed on the failure to warn claim to find for plaintiff if it believed that the Cutlass was sold to Mrs. Peters, the cruise control system was unreasonably dangerous when put to a reasonably anticipated use without knowledge of the characteristics, and the defendant did not warn of the danger. And finally, the jury was instructed on the negligence claim that to find for the plaintiff it had to find that the cruise control system on the Cutlass had a potential to suddenly and uncontrollably accelerate the vehicle, and the defendant failed to either design the cruise control system in the Cutlass to be reasonably safe or to adequately warn of the risk. All three theories of liability submitted to the jury pertain to the cruise control system installed in the Cutlass and share one common element: causation. *Zafft v. Eli Lilly & Co.,* 676 S.W.2d 241, 244 (Mo. banc 1984).

### C. Did Mr. Peters present substantial evidence from which the jury could reasonably infer that the cruise control was defectively designed and that it caused Mrs. Peters' injuries?

Mr. Peters claimed that GM's cruise control mechanism on the Peters' Cutlass was defectively designed and dangerous, which malfunctioned and caused the Cutlass to drastically accelerate from the Peters' driveway to the neighbor's tree where the impact of vehicle and tree resulted in horrendous injury to Mrs. Peters' body,

including her brain, immediately rendering her unconscious. He identified only two possible causes of the accident, and GM agreed—(1) a defectively designed and malfunctioning cruise control mechanism or (2) Mrs. Peters' application of the accelerator pedal. Mr. Peters concedes that the record is devoid of direct evidence establishing cruise control malfunction, but he asserts, nonetheless, that a reasonable juror could have inferred from the circumstantial evidence that Mrs. Peter's injuries were caused by a defectively designed and malfunctioning cruise control mechanism as opposed to Mrs. Peters' application of the accelerator pedal. Mr. Peters' tactical approach at trial was to offer expert opinion based on scientific evidence that the cruise control device was defectively designed and dangerously prone to permit acceleration without driver input and circumstantial evidence that eliminated the possibility that Mrs. Peters errantly applied the accelerator pedal during the event and proved that the accident was caused by GM's defectively designed and malfunctioning cruise control device.

 Sufficient circumstantial evidence will support a jury verdict in a products liability case. *Daniel v. Ind. Mills & Mfg., Inc.,* 103 S.W.3d 302, 309 (Mo.App. S.D.2003)(citing *Winters v. Sears, Roebuck & Co.,* 554 S.W.2d 565, 569 (Mo.App.1977)). A plaintiff who relies on circumstantial evidence, however, has the burden of establishing circumstances from which the claim may be inferred without resort to conjecture and speculation. *Weatherford v. H.K. Porter, Inc.,* 560 S.W.2d 31, 34 (Mo.App.1977)(citing *Hale v. Advance Abrasives Co.,* 520 S.W.2d 656, 658 (Mo.App.1975)). The circumstances proved must reasonably point to the desired conclusion and tend to exclude any other reasonable conclusion. *Id.* Evidence that points equally to a cause for which the defendant is responsible and to one for which the defendant is not responsible is not sufficient to make a submissible case. *Kircher v. Purina Mills, Inc.,* 775 S.W.2d 115, 117 (Mo. banc 1989); *Williams v. Nuckolls,* 644 S.W.2d 670, 673 (Mo.App. E.D.1982). Mr. Peters' burden of proof did not require that his evidence exclude all possibility of another cause of Mrs. Peters' injuries, nor was he required to present undisputed evidence. *Daniel,* 103 S.W.3d at 310. Mr. Peters met his burden of proof and could submit to the jury the issue of strict liability—defective design, if the facts and circumstances in evidence fairly warrant the conclusion that the cruise control device was defectively designed and dangerous and caused the accident and the resulting injuries to Mrs. Peters. *Id.* If Mr. Peters failed to make a submissible case of defective design, he failed to make a case of strict liability—failure to warn and negligence. MAI 25.09.

Mr. Peters presented three critical witnesses to prove his claims. He relied on Mr. Sero's expert opinion testimony to prove that the cruise control device was defectively designed and dangerous, having the potential to cause the vehicle equipped with it to accelerate without driver input. He depended on accident reconstruction expert Jerry Wallingford and neurologist Dr. Geoffrey Blatt to prove that accelerator pedal application was eliminated as a possible cause of the accident. Mr. Wallingford testified that the Cutlass must have accelerated after the vehicle sideswiped the tree; and Dr. Blatt testified that, assuming Mrs. Peters sustained the traumatic injuries to her arm and head when the vehicle sideswiped the tree, which GM does not contest, she would have been unconscious thereafter.

The logic of Mr. Peters' tactical presentation was that if the vehicle accelerated

after striking the tree, when Mrs. Peters was unconscious and thereafter could not have consciously applied the accelerator pedal, the cruise control must have caused the acceleration from the tree to the Peters' yard. Therefore, Mr. Peters reasoned, the cruise control device must have engaged before the vehicle struck the tree and before Mrs. Peters was rendered unconscious, and specifically when she started the vehicle and placed the transmission from park to reverse. No one asserts that Mrs. Peters activated the cruise control at any time during or immediately preceding the event. In fact, the evidence was that the cruise control switch was in the "off" position. Ergo, the cruise control malfunctioned because of its defective, dangerous design, which made it prone to activate without human input; and the defective cruise control caused the vehicle to accelerate from the driveway to the tree, causing the accident and Mrs. Peters' injuries.

1. **Mr. Sero's opinion testimony that the cruise control device was defectively designed and dangerous and caused the accident were admitted and are considered on the issue of submissibility**

■ GM argues that Mr. Sero's testimony regarding defective design and causation was speculative and, thus, so deficient in weight and credibility that it had little value on the issues. In arguing that Mr. Sero's testimony failed to make a submissible case, GM cites evidence that Mr. Sero's single transient fault theory is rejected by federal reports and that he alone among automotive electrical engineers advocates it. It also claims Mr. Sero's opinion is entitled to little value because Mr. Sero initially concluded that the cruise control was defectively designed because it lacked resistors, which protect a device from transient signals. When he later learned that the resistors were located on the circuit board in a resistive array, he criticized the resistors as not being true resistors and concluded that they constituted the design defect that permitted the transient fault to enter the device. GM also criticizes Mr. Sero's testing of the cruise control module. To test the module, Mr. Sero opened it and placed voltage directly into the system bypassing the resistors and, arguably, altering the design. Mr. Sero acknowledged that no one has ever caused the activation of a three-mode cruise control system by applying voltage to the module when it is closed and protected by the resistors. Finally, GM argued that Mr. Sero's opinion was at odds with the physical evidence and the testimony of Mr. Wallingford, the accident reconstructionist, regarding how the Cutlass traveled from the tree to the planter.

■ These arguments, however, challenge whether Mr. Sero's opinion testimony was supported by a sufficient factual or scientific foundation. Where a question exists as to whether the proffered opinion testimony of an expert is supported by sufficient factual or scientific foundation, the question is one of admissibility. *Washington by Washington v. Barnes Hosp.*, 897 S.W.2d 611, 616 (Mo. banc 1995). Admissibility is an issue only if a timely and specific objection is made. *Id.; Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 860 (Mo. banc 1993). As discussed above, GM did not timely object to the admissibility of Mr. Sero's expert opinion testimony, and the testimony was admitted as evidence. Because GM did not challenge the factual or scientific foundation of Mr. Sero's opinion testimony, it may not now raise these matters "under the guise of submissibility." *Washington*, 897 S.W.2d at 616. Whether Mr. Sero's opinion regarding defective design or causation was speculative or constituted conjecture is an issue of admissibility and not

submissibility. Once an expert's opinion testimony is admitted, as any other evidence, it may be relied upon to determine the submissibility of the plaintiff's case. *Id.* And the natural probative effect of the testimony is a consideration for the jury. *Id.* Mr. Sero's testimony regarding defective design and causation is considered when determining whether Mr. Peters made a submissible case.

### 2. Evidence of defective design and causation

 Viewing the evidence and reasonable inferences in the light most favorable to the jury's verdict, the trial court did not err in submitting strict liability—design defect and negligence to the jury. As discussed in detail in Section II above, Mr. Sero testified that Mrs. Peters' accident was not "an operator created incident," that the cruise control mechanism located on the Peters' vehicle was defectively designed and dangerous, and that a single transient fault actuated the throttle of the Peters' vehicle and caused the accident. Additionally, Mr. Peters' presented the testimony of accident reconstructionist expert, Jerry Wallingford, who asserted that after the Cutlass sideswiped the tree, it continued into the Peters' front yard and ultimately climbed the one-foot timber planter with both left wheels. Mr. Wallingford opined that the vehicle would not have had sufficient inertia to travel from the tree to the Peters' front yard and climb the planter with both tires without mechanical acceleration. He "guesstimated" that the Cutlass departed the tree toward the Peters' lawn at 5 miles per hour. He said that he could not scientifically determine its speed as it departed the tree and that no one else could. He

did not testify what speed was necessary for the vehicle to climb over and onto the planter with either one or two of the left wheels. Thus, Mr. Wallingford opined that the Cutlass accelerated from the tree to the planter, after Mrs. Peters was unconscious.[6]

Because no direct proof of the cause of the vehicle's movement from the tree to the Peters' yard was presented, and because two possible causes of the event were considered, Mr. Peters' theory that a defectively designed cruise control caused the accident required circumstantial proof that Mrs. Peters did not press the accelerator pedal. Neurologist Dr. Geoffrey Blatt's testimony was critical to Mr. Peters' theory of the case. Dr. Blatt testified that the injuries Mrs. Peters sustained were not the kind of injuries one receives when one's person is inside a vehicle. He was asked to assume that Mrs. Peters' injuries resulted when the Cutlass she was driving sideswiped the tree. (As noted, GM does not refute that Mrs. Peters' injuries resulted when the vehicle sideswiped the tree.) He said that, assuming the injuries resulted as hypothesized, Mrs. Peters could not consciously have applied her foot to the accelerator pedal after her vehicle sideswiped the tree because of her unconscious state. Mr. Peters also notes in his brief that GM's human factor expert, Dr. Douglas Young, testified during cross-examination that in his opinion, Mrs. Peters' foot would have come off of the accelerator when the vehicle struck the tree. And the evidence revealed that Mrs. Peters' husband found his wife immediately after the event with her upper body lying across the passenger seat. Although the record is unclear, apparently neither foot

---

6. Like Mr. Sero's opinion testimony, the admissibility of the testimony of Mr. Wallingford was untested by GM when it was offered. Thus, the question of whether the testimony was admissible was waived, and it can be relied on when determining the submissibility of the case. *Washington*, 897 S.W.2d at 616.

was on either the accelerator pedal or the brake pedal when Mr. Peters attempted to comfort his wife. Both Mr. Wallingford and Mr. Sero relied on the evidence that Mrs. Peters was unconscious after her vehicle hit the tree to infer that Mrs. Peters' pressing the accelerator with her foot was eliminated as a cause of the vehicle's sudden acceleration. Thus, they concluded, the cause of the accident was a defective cruise control.

Finally, Mr. Peters presented the videotaped deposition testimony of Chester Rozanski and Marshall Meads, GM engineers. Each became concerned in the late 1980's that the three-mode cruise control system might cause sudden and unwanted acceleration and recommended that GM install another type of cruise control system on vehicles that it manufactured, which GM eventually did in 1994. Their testimonies were offered to prove that GM knew for several years about the claimed defective cruise control and failed to equip the vehicles it manufactured with a safer product until 1994, a year after GM manufactured the Peters' vehicle. They testified that for several reasons, including added safety, they recommended that GM use a different type of cruise control.

As discussed, a products liability case does not require an impossible standard of proof, and Mr. Peters was not required to present indisputable evidence excluding all possibility of another cause of the accident. *See Daniel,* 103 S.W.3d at 310. The facts and circumstances admitted in evidence in this case fairly warranted the conclusion that the cruise control device on the Peters' vehicle was defectively designed and dangerous and that it caused the accident and Mrs. Peters' injuries. The evidence was, therefore, sufficient to make a submissible case of strict liability—design defect and negligence. Point I is denied.

## D. Did Mr. Peters make a submissible case of failure to warn?

In Point II, GM claims that Mr. Peters failed to prove his failure to warn claim. It asserts that no evidence was presented on the issue. Chester Rozanski, a GM engineer, testified in his deposition that, to his knowledge, GM had never warned customers about the defective nature of the three-mode cruise control. Contrary to GM's assertion, this portion of Mr. Rozanski's deposition was admitted into evidence and supported the submission of the failure to warn claim. The point is denied.

## IV. Exclusion of Dr. Moffatt's rebuttal evidence

GM asserts that the trial court erred in excluding Dr. Charles Moffatt's rebuttal testimony to Mr. Peters' claim that GM's defense was dependant on whether one or both left tires of the Cutlass crossed the landscape timber after the vehicle traveled 95 feet from the tree to the conclusion of its journey. Dr. Moffatt was GM's accident reconstructionist, whose testimony was of his analysis of the September 16 accident and events immediately before and after, and included his opinion of the speeds and movement of the Peters' Cutlass as the vehicle left the tree and as it climbed the yard timbers in the Peters' front yard. His opinion was that the vehicle climbed the timbers with one wheel and not two as asserted by Mr. Wallingford. He had expressed this opinion during deposition and at trial. When GM enquired of him what the physics were for the vehicle to climb the timbers with two wheels, Mr. Peters objected, claiming that he was changing his opinion and that he had not been informed before trial. Dr. Moffatt denied that he was changing his opinion that one tire had crossed the timbers.

The trial court sustained the objection. GM made an offer of proof.

To understand the significance of Dr. Moffatt's testimony to the defense and GM's assertion of error, a synopsis of Dr. Moffatt's testimony is helpful. He surveyed the scene some two years after the incident, and he utilized the police accident investigation report and various techniques to identify the exact location of the vehicle at different times as it journeyed from the driveway to the tree and from the tree to the yard timbers. He considered the physical circumstances of the scene, including, for example, the slope of the Peters' lawn, and he inspected the Peters' vehicle and considered the damage sustained by it as a result of its contact with the tree. He participated in planning the testing of vehicle capabilities and reviewed and approved the tests using an exemplar automobile and the test results. Dr. Moffatt determined, unlike Mr. Wallingford, that one tire and not two climbed the yard timbers. The tests included determination of the speed at which the exemplar vehicle used in the testing required in order to mount yard timbers like those in the Peters' front yard with one tire. The vehicle mounted the timbers used in the tests when the vehicle was traveling at five miles per hour. Dr. Moffatt considered the physical circumstances at the location of the incident and used mathematical formulae and a computer program to calculate that for the Peters' vehicle to climb the timber with a single tire at five miles per hour it would have departed the tree at 12.8 miles per hour. He calculated the speed of the vehicle at 19.42 miles per hour when the vehicle sideswiped the tree, and the difference of about 6 miles per hour between the two speeds was the result of the energy "scrubbed off" by the collision. Dr. Moffatt, informed that Mr. Peters' theory was that two tires climbed the planter, was asked if two tires climbing the planter

instead of one would change his opinion regarding the reconstruction of the accident and his opinion that the vehicle's inertia carried it to the place where it stopped on the planter and that it did not accelerate after sideswiping the tree. He said that it would not, and he was asked to explain. Mr. Peters then objected, asserting that Dr. Moffatt was changing his opinion from that disclosed to him prior to trial. The court sustained the objection, precluding Dr. Moffatt's explanation and further testimony regarding the physics required for two tires to mount the planter and that impact on whether the vehicle accelerated after striking the tree as claimed by Mr. Peters. GM made an offer of proof, during which Dr. Moffatt stated that for two wheels to mount the timbers, the speed of the vehicle required at the timbers would have been 7.07 miles per hour. He stated that for the two left wheels to traverse the timbers in the Peters' front yard as a result of the vehicle's inertia and without accelerating from the tree, the vehicle would have had to depart the tree traveling at 13.75 miles per hour, less than one mile per hour difference from the 12.8 miles per hour required for one wheel to climb the timbers, which he said was within the margin of error of his calculation for the speed of the vehicle when it departed the tree. Dr. Moffatt stated that these calculations and Mr. Peters' position that the left two tires of the vehicle climbed the planter did not change his opinion that only one tire climbed the planter or that the vehicle did not experience mechanical acceleration when it departed the tree.

## A. Standard of Review

Admissibility of evidence lies within the sound discretion of the trial court and will not be disturbed absent abuse of discretion. *Nelson v. Waxman,* 9 S.W.3d 601,

603 (Mo. banc 2000). The trial court abuses its discretion when its ruling is clearly against the logic of the circumstances then before the trial court and is so unreasonable and arbitrary that the ruling shocks the sense of justice and indicates a lack of careful deliberate consideration. *Id.*

"When an expert who has been deposed later changes his or her opinion before trial or bases it on new or different facts from those revealed at the deposition, the party intending to use the expert's testimony has the duty to disclose the new information to the opposing party, effectively updating the responses made during the deposition." *Whitted v. Healthline Mgmt., Inc.,* 90 S.W.3d 470, 475 (Mo.App. E.D.2002). When the expert's opinion is not properly disclosed, the trial court "is vested with broad discretion as to its choice of a course of action and may, in the sound exercise of its discretion, reject such evidence or impose other appropriate sanctions." *Pasalich v. Swanson,* 89 S.W.3d 555, 561 (Mo.App. W.D.2002)(quoting *Cooper v. Ketcherside,* 907 S.W.2d 259 (Mo. App. W.D.1995)).

### B. Dr. Moffatt's proffered testimony was not a change of opinion

Dr. Moffatt's proffered testimony was not a change in his opinion that the Peters' vehicle climbed the planter with one left wheel and not two and that the vehicle did not accelerate from the tree to its final resting place but that its inertia propelled it onto the planter. Mr. Wallingford claimed that the vehicle climbed the yard timbers with the two left wheels. This was significant to his testimony and claim that the vehicle accelerated from the tree to its resting place. The inference was that greater energy was required for the vehicle to mount the timbers with two tires than was required for it to mount them with one, and that to mount the

planter with two tires, the vehicle must have accelerated from the tree to the planter while Mrs. Peters was unconscious. Dr. Moffatt's proffered testimony was to express his opinion regarding the energy needed for the vehicle to climb the planter with two tires rather than one and to compare the difference. According to Dr. Moffatt, for the vehicle to have enough inertia for it to have climbed the planter with two tires rather than one, the vehicle departed the tree at a speed of less than one mile per hour faster that was needed to mount the planter with only one wheel, within Dr. Moffatt's margin of error in determining the speed of the vehicle as it departed the tree. Dr. Moffatt's proffered testimony was not a change in his opinion, and the court erred in excluding it on the basis that it was.

Mr. Wallingford's opinion testimony was offered to prove causation. The thrust of his testimony was that the vehicle accelerated from the tree to its final resting place while Mrs. Peters was unconscious. Mr. Wallingford's opinion emphasized that the energy required for the vehicle to mount the yard timbers with the two left tires meant that the vehicle accelerated from the tree to the planter and that the vehicle's inertia would not have been sufficient to propel both wheels over the timbers. Thus, the cause of the acceleration was a defective cruise control.

Dr. Moffatt's proffered testimony contested this theory. His testimony was relevant and substantial and did not constitute a change in his opinion that the vehicle did not accelerate from the tree to the planter or that the vehicle mounted the planter with one tire. His testimony was to explain the physics to demonstrate that the vehicle's inertia carried it to its resting place and that it did not accelerate from the tree, and, thus, the absence of evidence of a malfunctioning cruise con-

trol. It was legitimate rebuttal to Mr. Wallingford's position, and because of the significance of the issue to the case, GM was prejudiced by the exclusion of the proffered testimony. The point is granted.

## V. Punitive Damages

GM asserts as Point VII that the trial court erred in submitting punitive liability and in denying its motion for Judgment Notwithstanding the Verdict, claiming that Mr. Peters failed to prove by clear and convincing evidence that GM's conduct created a high degree of probability of injury and constituted complete indifference to or conscious disregard for the safety of others. GM objected to the submission of punitive damages for lack of evidence and preserved the issue for appellate review.

### A. Standard of Review

■■■■ Appellate review of whether the evidence offered at trial was sufficient to submit a claim for punitive damages is determined as a matter of law. *Hoskins v. Business Men's Assurance,* 116 S.W.3d 557, 564–65 (Mo.App. W.D.2003), *overruled on other grounds by Werremeyer v. K.C. Auto Salvage Co., Inc.,* 134 S.W.3d 633 (Mo. banc 2004). The evidence and reasonable inferences therefrom are considered in a light most favorable to the plaintiff while disregarding unfavorable evidence and inferences. *Id.* at 565. Appellate authority does not "supply missing evidence or give [Plaintiffs] the benefit of unreasonable, speculative, or forced inferences." *Id.* (quoting *Davis v. Board of Educ.,* 963 S.W.2d 679, 684 (Mo.App. E.D. 1998)). "We view the evidence and inferences in the light most favorable to submissibility, keeping in mind that we are looking for evidence that establishes with convincing clarity that the defendant's conduct was outrageous because of evil

motive or reckless indifference." *Perkins v. Dean Machinery Co.,* 132 S.W.3d 295, 300 (Mo.App. W.D.2004).

■■■■ "Ordinarily [exemplary] damages are not recoverable in actions for negligence, because negligence, a mere omission of the duty to exercise care, is the antithesis of willful or intentional conduct." *Hoover's Dairy, Inc. v. Mid–America Dairymen, Inc./Special Products, Inc.,* 700 S.W.2d 426, 435 (Mo. banc 1985)(quoting *Sharp v. Robberson,* 495 S.W.2d 394, 397 (Mo. banc 1973)). Punitive damages are properly submitted in a strict liability case only if there is clear and convincing evidence that defendants "placed in commerce an unreasonably dangerous product with actual knowledge of the product's defect." *Letz v. Turbomeca Engine Corp.,* 975 S.W.2d 155, 164–65 (Mo.App. W.D. 1997). Both strict liability and negligence theories require evidence "that the defendant showed a complete indifference to or conscious disregard for the safety of others." *Id.* at 165; *see also Barnett v. La Societe Anonyme Turbomeca France,* 963 S.W.2d 639, 659 (Mo.App. W.D.1997)(discussing the fact that "[i]n the context of products liability actions, the legal standard for submitting punitive damages depends on whether the underlying theory is in strict liability or in negligence" and explaining the submissibility standards for each). "Conscious disregard or complete indifference" includes situations where the person doing the act or failing to act must be conscious from the knowledge of surrounding circumstances and existing conditions, that, although lacking specific intent to injure, the person's conduct or failure to act will naturally or probably result in injury. *Hoskins,* 116 S.W.3d at 583, 564. Punitive damages are appropriate, therefore, only when the defendant's conduct is outrageous due to evil motive or reckless indifference to the rights of others, which

must be proven by clear and convincing evidence. *Blue v. Harrah's North Kansas City, LLC,* 170 S.W.3d 466, 477 (Mo.App. W.D.2005).

The rationale for permitting punitive damages is the furthering of society's interests of punishing unlawful conduct and deterring its repetition, and punitive damages are constitutionally permissible. *BMW of North Am., Inc. v. Gore,* 517 U.S. 559, 567, 116 S.Ct. 1589, 1595, 134 L.Ed.2d 809 (1996). Thus, punitive damages "are imposed for the purpose of punishment and deterrence." *Rodriguez v. Suzuki Motor Corp.,* 936 S.W.2d 104, 110 (Mo. banc 1996)(quoting *State ex rel. Smith v. Greene,* 494 S.W.2d 55, 60 (Mo. banc 1973)). Because the remedy is so extraordinary or harsh, punitive damages should be applied only sparingly, "clear and convincing" evidence is the standard of proof established by the Missouri Supreme Court in *Rodriguez.* *Id.* The imposition of a punitive award implicates Fourteenth Amendment due process concerns. *Honda Motor Co., Ltd. v. Oberg,* 512 U.S. 415, 114 S.Ct. 2331, 129 L.Ed.2d 336 (1994). "A decision to punish a tortfeasor by means of an exaction of exemplary damages is an exercise of state power that must comply with the Due Process Clause of the Fourteenth Amendment." *Id.* at 434–35, 114 S.Ct. 2331. The constitutional concerns are both procedural and substantive. *See BMW,* 517 U.S. at 559, 116 S.Ct. 1589. Procedurally, the "traditional common law approach," which includes proper jury instruction and review of a jury award by the trial court and an appellate court, generally satisfies due process. *See Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 15, 111 S.Ct. 1032, 1041–1042, 113 L.Ed.2d 1 (1991).

To satisfy the "clear and convincing" standard of proof, evidence must show that the defendant either knew or had reason to know that there was a high degree of probability that the defendant's conduct would result in injury. *Lopez v. Three Rivers Elec. Co-op., Inc.,* 26 S.W.3d 151, 160 (Mo. banc 2000). Actual knowledge of the dangerous condition furnishes the element of reckless conduct justifying a punitive damage award. *Hoover's Dairy, Inc.,* 700 S.W.2d at 437. The defendant's conduct must be tantamount to intentional wrongdoing where the natural and probable consequence of the conduct is injury. *Lopez,* 26 S.W.3d at 160. "With such a showing, a plaintiff can recover for aggravating circumstances based upon the defendant's complete indifference to or conscious disregard for the safety of others." *Id.* The "clear, cogent and convincing" standard of proof established in *Rodriguez* requires evidence "which instantly tilts the scales in the affirmative when weighed against evidence in opposition; evidence which clearly convinces the fact finder of the truth of the proposition to be proved." *Lewis v. FAG Bearings Corp.,* 5 S.W.3d 579, 582–83 (Mo.App. S.D.1999). "In a search for clear and convincing evidence, the circuit court must scrutinize the evidence in much closer detail than it does in cases in which the standard of proof is a mere preponderance." *Lopez–Vizcaino v. Action Bail Bonds, Inc.,* 3 S.W.3d 891, 893 (Mo.App. W.D.1999). "The circuit court must determine whether the evidence—giving full play to the jury's right to determine credibility, weigh the evidence and draw justifiable inferences of fact—is sufficient to permit a reasonable juror to conclude that the plaintiff established with convincing clarity—that is, that it was highly probable—that the defendant's conduct was outrageous because of evil motive or reckless indifference." *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S.

242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

## B. Discussion

■ To satisfy the standard of proof for exemplary damages, Mr. Peters was compelled to present evidence that GM knew that the three-mode cruise control device placed aboard the Peters' Cutlass was defectively designed and dangerous because it had a propensity to cause the throttle on the vehicle to actuate without driver input and, knowing of its dangerous propensity, GM, either "willfully or with reckless indifference," placed the defective device on the Peters' Cutlass. *See Perkins,* 132 S.W.3d at 300.

Mr. Sero testified that the cruise control on the Peters' Cutlass was defectively designed and caused the accident. As discussed, *supra,* his opinion testimony was admitted because the scientific basis for his theory and opinion that the design of the device would permit a single transient fault to actuate it and cause the vehicle to accelerate, which caused the Peters' accident, was not objected to. Therefore, analysis is made of whether Mr. Peters presented "clear and convincing" evidence that GM willfully or with reckless indifference placed the defectively designed cruise control in commerce knowing it to be dangerous.

The evidence offered by Mr. Peters that GM knew or may have known that the device was defectively designed included the testimony of GM engineers, Mr. Rozanski and Mr. Marshall. Each was concerned in the late 1980s that the three-mode cruise control might cause sudden and unwanted acceleration. Laboratory tests were performed to determine whether a transient charge could actuate the device, and though no evidence was presented that they were able to cause the device to actuate without applying external voltage or outside the laboratory, each reported his concern and recommendation within the GM system and recommended that a stepper cruise control system be used instead of the three-mode system, like the device on the Cutlass. The stepper system was placed on GM manufactured vehicles beginning in 1994 instead of the three-mode system, the timetable proposed by Mr. Meads and other GM engineers. One of the several reasons for recommending the change was for increased safety, but Mr. Rozanski testified that the three-mode cruise control device like the one on the Peters' Cutlass was safe.

Evidence of Project 1800 was also introduced. The project was a GM cost savings effort in the 1980s and 1990s. The project was a cost savings analysis to determine whether GM could "take $1800 worth of cost out of their vehicles." It was not related directly to the cruise control on GM manufactured vehicles. The evidence was introduced to imply that GM's motive for its not manufacturing W cars with stepper cruise control devices instead of three-mode devices before 1994 was to save money. Daniel Crawford, the engineer who designed the three-mode cruise control device, testified that it had limited durability because a part within it would eventually wear out. He stated that GM had determined to use the stepper cruise control devices instead of the three-mode system and executed a plan to do so. The stepper cruise control device would actually save GM money, according to Mr. Crawford.

Two hundred thirteen 1241 reports were offered to demonstrate that GM had notice that the three-mode cruise control device was defectively designed and dangerous. As discussed *supra,* only seventy-four of the admitted reports referenced vehicles with cruise control. The criteria for their

admission was (1) whether the person reporting the incident reported that the vehicle manifested sudden or uncontrolled acceleration without driver input, (2) whether the acceleration occurred when the vehicle was stopped and the transmission was placed from park to drive or reverse, and (3) whether any mechanical or electrical problems were identified as causal factors. The 213 vehicles about which the reports were made informed GM that something might have caused sudden acceleration of certain GM manufactured vehicles when the vehicle was stopped and the transmission was placed from park to drive or reverse and where no mechanical or electrical problems were identified that could cause the occurrence. As noted earlier, however, 139 of the reports were of incidents involving vehicles that did not have a cruise control device and should not have been admitted. The admission of the 74 reports is assumed to have been proper for the purpose of considering whether the reports placed GM on notice of a possible defect and whether clear and convincing evidence was presented to justify the punitive damages award.

To submit on the issue of punitive damages, GM must have had actual knowledge of the cruise control's dangerous proclivity to permit a transient charge to enter the device and cause the vehicle on which it was installed to accelerate without driver input, and GM must have, with evil motive or reckless indifference, placed the Peters' Cutlass in commerce. Despite Mr. Sero's unobjected to testimony that the cruise control device was defectively designed and dangerous, the evidence, in the light most favorable to Mr. Peters, does not establish that GM knew of the defective design asserted by Mr. Sero. GM was aware that the device might malfunction under certain laboratory conditions, but as Mr. Sero testified, no one has ever been able to cause the device to actuate a vehicle throttle without opening it and applying voltage directly to the device at specific locations, bypassing the protective resistor devices. GM, however, determined that it would install a stepper cruise control system on the vehicles that it manufactured instead of the three-mode system and commenced a plan to do so. The change occurred in 1994 vehicle models, sold to the public in 1993. Although GM evaluated how it could cut costs in its vehicles before the change, no evidence was produced that GM continued to install the three-mode system until 1993 to save costs knowing that by doing so it placed a dangerous device in commerce. The evidence was that the stepper system would actually save GM money. Thus, the evidence—"giving full play to the jury's right to determine credibility, weigh the evidence and draw justifiable inferences of fact—was insufficient to permit a reasonable jury to conclude that [Mr. Peters] established with convincing clarity—that is, that it was highly probable—that [GM's] conduct was outrageous because of evil motive or reckless indifference." *Lopez–Vizcaino*, 3 S.W.3d at 893. Therefore, because the evidence is not persuasive that GM acted with evil motive or reckless indifference when it sold the Cutlass, the standard requiring clear and convincing evidence was not met. Mr. Peters failed to prove a case for punitive damages. The point is granted.

## CONCLUSION

The trial court erred in admitting the testimony of seven witnesses regarding their incidents of acceleration, in admitting 139 reports of complaints made to GM of other claimed sudden acceleration incidents involving GM manufactured vehicles, and in precluding the testimony of Dr. Moffatt regarding the physics of the two left tires of the Peters' vehicle ascending

the garden timbers and his comparison to the physics of only one tire transcending the timbers. GM was prejudiced by these errors. Mr. Peters failed to prove entitlement to punitive damages, and the claim for punitive damages is concluded. GM's remaining points of error need not be addressed.

The judgment is reversed, and the case is remanded for a new trial.

Judge ROBERT G. ULRICH writes for the majority. Judges PAUL M. SPINDEN, JAMES M. SMART, THOMAS H. NEWTON, RONALD R. HOLLIGER, LISA WHITE HARDWICK, and Senior Judges, FOREST HANNA, GENE MARTIN, and JOHN MORAN concur.

Judge HAROLD L. LOWENSTEIN writes a dissenting opinion.

Judge VICTOR C. HOWARD concurs with Judge ULRICH's majority opinion in all respects except the submissibility of punitive damages in which he concurs with Judge LOWENSTEIN's dissent.

HAROLD L. LOWENSTEIN, Judge, dissenting.

I concur in that portion of the majority opinion that holds that Mr. Peters made a submissible case, but dissent with respect to the majority's opinion that holds that trial error was prejudicial and necessitates a new trial. I think the amount of the judgment is excessive. I would affirm the judgment subject to remittitur of the amount of actual and punitive damages and would remand only for recomputation of the amount of prejudgment interest. Therefore, all of GM's points on appeal will be addressed.

There are several additional facts favorable to the jury verdict. Mrs. Peters, a teacher of gifted students was leaving the house to go to Hickman Mills High School. There was no evidence or inference that she was in a rush or was late. There was a horrific accident when the car went down the driveway, across the street, and struck a tree with sufficient force to partially sever her arm and cause seven skull fractures. After hitting the tree, with the driver unconscious, the car came back across the street, in reverse. Both tires on the left side of the car went over the foot high planter, with one tire in the box when the car came to a rest. I would differ with the majority's statement of the facts where it states that there was no evidence of a malfunction that caused the accident. There was no direct evidence in this case that Mrs. Peters caused the accident. There was no direct evidence the cruise control or any other means of accelerating the car caused the accident. Evidence either way was circumstantial. There were reasonable inferences from the evidence which indicated Mrs. Peters did not accelerate the car in reverse to cause the collision with the tree. It was inferable from the evidence that the car continued to self-propel after the collision with the tree. It was for the trier of fact to infer the Cutlass malfunctioned, causing the accident.

### I. GM's Points on Appeal
### A. EVIDENCE OF SIMILAR INCIDENTS

#### 1. Seven Witnesses

The majority holds that the trial court erred in allowing the admission of evidence of other similar accidents. I disagree and would affirm the decision of the trial court to allow the testimony of the seven witnesses. The events were sufficiently similar to the Peters' accident. The testimony of all but one of the seven witnesses that the vehicle continued to accelerate despite the application of the brake pedal is not a

fatal dissimilarity—all of the accidents were the result of the same cause: sudden acceleration.

Evidence of other similar accidents may be admitted if the other accidents are of like character, occurred under substantially the same circumstances, and resulted from the same cause. *Lopez v. Three Rivers Elec. Coop., Inc.*, 26 S.W.3d 151, 159 (Mo. banc 2000). A trial court is afforded wide discretion in deciding whether to admit evidence of similar occurrences. *Alcorn v. Union Pac. R.R. Co.*, 50 S.W.3d 226, 244 (Mo. banc 2001). Concerning the admission of evidence of similar occurrences:

> [j]udicial discretion is abused when the trial court's ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration; if reasonable people can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion.

*Newman v. Ford Motor Co.*, 975 S.W.2d 147, 151 (Mo. banc 1998) (citing *Richardson v. State Highway & Transp. Comm'n*, 863 S.W.2d 876, 881 (Mo. banc 1993)).

There are many similarities between Mrs. Peters' accident and the other accidents testified to by the seven witnesses. Each incident testified to by the seven witnesses involved a "W" car that was equipped with the three-mode cruise control system also used in the Peters' car. Each incident occurred as the driver was shifting from park into reverse and was attempting to "back out" from a parked position. The witnesses also testified that they did not inadvertently depress the accelerator to cause the sudden acceleration. Furthermore, in each instance, a GM representative investigated the accident and, like the case at bar, did not discover any evidence of a mechanical or electrical malfunction.

The majority asserts that the other accidents were not sufficiently similar to the accident here because there was no definitive reason provided as to the cause of those accidents, let alone that defective cruise control was the cause. However, this ignores the fact that a disputed proposition of fact may be proven by circumstantial evidence. "[A]bsolute certainty of causation is not required in a product liability case and ... 'probative facts' established by circumstantial evidence ... pointing to the desired conclusion with enough certainty to be reasonable and probable is sufficient." *Duke v. Gulf & W. Mfg. Co.*, 660 S.W.2d 404, 410 n. 3 (Mo. App.1983) (citing *Lifritz v. Sears, Roebuck & Co.*, 472 S.W.2d 28, 32–33 (Mo.App. 1971)).

GM presented evidence that incidents of sudden acceleration are normally caused by pedal (driver) error. However, all seven witnesses testified that they had not inadvertently pressed on the accelerator. This jury could have found that testimony credible. The other possible cause of sudden acceleration in these accidents is pedal misapplication. Although none of the witnesses specifically ruled it out as the cause of their accidents, the fact that pedal misapplication rarely causes sudden acceleration combined with the fact that several of the witnesses testified to multiple occurrences of sudden acceleration would allow a reasonable inference that their vehicles had defective cruise control systems. Because of the wide discretion that a trial court has in the admission of evidence and the fact that reasonable minds could differ on the issue, this court should not say that the trial court abused its discretion in allowing the jury to hear these witnesses.

The majority holds that the trial court could not reasonably conclude that the in-

cidents of sudden acceleration resulted from the same cause that Mr. Peters asserted. Because six of the witnesses testified that they applied the brake pedal when the car suddenly accelerated and Sero testified that applying the brake pedal would have disengaged a malfunctioning cruise control, the majority holds that the incidents were dissimilar. What the majority discounts is that all seven of the witnesses testified that the accidents they were involved in occurred because the car suddenly accelerated, that they did not place their foot on the gas pedal, and that the incident occurred as they shifted the car from park into reverse. The similar cause here is *sudden acceleration.* Given that this court is required to allow a trial court wide discretion on admitting evidence of similar incidents, "[o]ur review is limited to a finding that the trial court first satisfied itself that the evidence was relevant to an issue of the case and that the *occurrences bore sufficient resemblance to the injury-causing incident, while weighing the possibility of undue prejudice or confusion of issues.*" *Pierce v. Platte–Clay Elec. Coop., Inc.,* 769 S.W.2d 769, 774 (Mo. banc 1989). The trial court did as much here, and this court should not say that the decision shocks a sense of justice. There are enough similarities between the incidents that reasonable minds could conclude that evidence of the incidents should be admitted.

### 2. Reports of complaints made to GM (called 1241 reports)

As to only the 139 reports admitted where there was no cruise control, I would agree with the majority; they should not have been admitted. However, I disagree with the majority's conclusion that the admission of these reports resulted in prejudice to GM.

The consumer complaint forms were only admitted as to notice. Seventy-four reports of similar incidents are still more than sufficient to establish that GM knew of its allegedly dangerous cruise control system. While the trial court erred in admitting the reports involving cars without cruise control systems, doing so was not prejudicial to GM in light of the 74 reports properly admitted.

The majority takes issue with Peters' counsel for arguing during closing argument that the reports should be used as substantive evidence. There was no *objection* to the arguments. The matter is *not preserved.* The jury had before it a limiting instruction which outlined the use of the reports and an instruction that closing argument is not evidence. Therefore, no prejudice resulted.

### B. Exclusion of GM's Rebuttal Evidence

The majority holds that the trial court erred in excluding a line of testimony from GM's accident reconstruction expert, Dr. Charles Moffatt, which was offered in rebuttal to Peters' characterization of GM's theory on the cause of the accident. GM specifically argues that since Peters stated in opening statement that GM's entire case "hinged on" only one tire of the Peters' car climbing the planter, Dr. Moffatt's testimony should have been allowed to rebut this alleged mischaracterization. While this may be the case, I disagree with the majority's conclusion because this point is not reviewable as GM failed to provide this court with Dr. Moffatt's deposition transcript. Consequently, this court cannot review the point.

According to GM, Dr. Moffatt testified at his deposition that he believed Mrs. Peters' car reached its final point of rest on its own momentum. Dr. Moffatt stated he reached this conclusion by calculating

the speed at which the car would have had to be traveling in order to hit and "spin off" the tree in the yard across the street, accelerate back across the street into the Peters' yard, and ultimately come to rest with one tire in the planter. Because Peters' theory of how the accident occurred was based on two tires of the car climbing the planter, he highlighted this distinction in his opening statement.

When called at trial, Dr. Moffatt again testified that Mrs. Peters' car traveled to its resting point on its own momentum and stated that he based his analysis on one tire entering the planter. GM then sought to dispel the importance of the one-tire versus two-tire distinction previously emphasized by Peters. Dr. Moffatt attempted to explain that while his analysis was indeed based on the fact that only one tire climbed the planter, his ultimate conclusion would have remained the same even had he assumed that two tires climbed the planter. Peters objected, arguing that this testimony was a new opinion and the trial court sustained their objection.

Determination of whether Dr. Moffatt's trial testimony did, in fact, constitute a new opinion, depends on the exact nature of what he stated in his deposition. GM failed to include a copy of Dr. Moffatt's deposition transcript in compiling the record on appeal. Absent its inclusion, this court cannot evaluate the alleged discrepancy between Dr. Moffatt's deposition testimony and trial testimony. *City of Joplin v. Flinn,* 914 S.W.2d 398, 401 (Mo.App. 1996) (citing Rule 81.12, which requires appellant to compile a record consisting of all evidence necessary to the determination of all questions presented). Specifically, "evidentiary omissions will be taken as . . . unfavorable to the appellant." *Sydnor v. Dir. of Revenue,* 876 S.W.2d 627, 628 (Mo. App.1994) (quoting *Delf v. Cartwright,* 651

S.W.2d 622, 624 (Mo.App.1983)). Point denied.

## C. DAMAGES

I would hold that that there was substantial evidence for the jury to find that GM possessed the requisite knowledge needed to submit punitive liability to the jury. I would remit the compensatory damages to $10,000,000 and the loss of consortium claim to $2,000,000. Finally, I would remit the punitive damages to $5,000,000.

GM claims that the compensatory and punitive damage awards were excessive. A jury verdict on damages will not be disturbed unless grossly excessive or inadequate. *Sandifer v. Thompson,* 280 S.W.2d 412, 415 (Mo.1955). In reviewing the question of an excessive verdict, an appellate court views the evidence in a light most favorable to the plaintiff. *Triplett v. Beeler,* 268 S.W.2d 814, 819 (Mo. 1954). There are two situations in which an appeal of an excessive verdict arises: (1) when the verdict is disproportionate to the injury and results from an honest mistake by the jury in assessing the evidence and may be corrected by remittitur without resorting to a new trial; and (2) when the excessiveness is engendered by trial misconduct and results from bias and prejudice and may be corrected only by a new trial. *Barnett v. La Societe Anonyme Turbomeca France,* 963 S.W.2d 639, 655 (Mo.App.1997).

"Where the jury errs by awarding a verdict that is simply too bountiful under the evidence, injustice may be prevented by ordering a remittitur." *Letz v. Turbomeca Engine Corp.,* 975 S.W.2d 155, 175 (Mo.App.1997). Section 537.068 provides, "A court may enter a remittitur order if, after reviewing the evidence in support of the jury's verdict, the court finds that the jury's verdict is excessive because the

amount of the verdict exceeds fair and reasonable compensation for the plaintiff's injuries. . . ." Remittitur is intended to result in equitable compensation and to eliminate the necessity and expense of retrial. *Letz*, 975 S.W.2d at 175.

### 1. AMOUNT OF COMPENSATORY DAMAGES

Compensatory awards adopted by the trial court will be reviewed for an abuse of discretion, and the amount must be so grossly excessive that it shocks the conscience and convinces the court that the trial judge and the jury have abused their discretion. *Willman v. Wall*, 13 S.W.3d 694, 699 (Mo.App.2000); *Hatch v. V.P. Fair Found., Inc.*, 990 S.W.2d 126, 141 (Mo.App.1999).

The factors utilized by an appellate court in determining excessiveness in personal injury cases are: (1) the loss of present and future income; (2) medical expenses; (3) age; (4) the nature and extent of injuries; (5) economic factors; (6) awards in comparable cases; and (7) the superior opportunity of jury and trial court to appraise the injuries and other damages. *Barnett*, 963 S.W.2d at 657.

The ultimate test on the amount of compensatory damages is whether the amount awarded fairly and reasonably compensates the plaintiff for the injuries suffered. *Willman*, 13 S.W.3d at 699. The issue here is whether the amount was "grossly" excessive, which indicates bias and/or prejudice and would necessitate a new trial, or "merely" excessive, in which case the mistake can be corrected by a remittitur of the excess amount. *Ince v. Money's Bldg. & Dev., Inc.*, 135 S.W.3d 475, 478 (Mo.App. 2004).

In this case, the jury awarded Peters $20 million. The evidence was that there would be $8,360,319 in lost income and expenses for Mrs. Peters' care over her remaining fifteen-year life expectancy.

However, under the factors listed in *Barnett*, and particularly in view of awards in other cases, I believe the compensatory award is excessive and should be remitted to $10 million.

Peters' consortium claim is separate and independent of his wife's claim. The verdict amount on this claim, $10 million, is excessive and should be remitted to $2 million. Similar to the defendant's argument in *Blond v. Overesch*, 527 S.W.2d 663, 671–72 (Mo.App.1975), the appellant in this point does not question the nature and extent of the injuries but merely argues that the verdict is excessive.

I believe the compensatory award of $20 million is excessive and should be reduced $10 million. The loss of consortium award of $10 million is also excessive and should be remitted to $2 million.

### 2. PUNITIVE DAMAGES

#### A. PUNITIVE LIABILITY

The majority holds that Peters failed to prove a case for punitive damages and, therefore, the trial court erred when it submitted punitive liability to the jury. I disagree in light of the seven witness' testimony, the seventy-four accident reports and the former GM engineers' testimony. Review of submission of punitive damages is conducted in a light most favorable to non-moving party, and should not be withdrawn from the jury unless facts in evidence and reasonable inferences therefrom, are so strongly against the plaintiff that reasonable minds could not differ. *Barnett*, 963 S.W.2d at 659.

In a product liability action based on negligence, punitive damages may be awarded if the defendant showed a complete indifference to or a conscious disregard for the safety of others. *Stojkovic v. Weller*, 802 S.W.2d 152, 155 (Mo. banc 1991). In a strict liability case, the plain-

tiff must also show that the defendant introduced the offending product into the stream commerce with actual knowledge of its defect. *Angotti v. Celotex Corp.,* 812 S.W.2d 742, 746 (Mo.App.1991). The purpose of punitive damages is to inflict punishment and to serve as an example and a deterrent to similar conduct. *Vaughan v. Taft Broad. Co.,* 708 S.W.2d 656, 660 (Mo. banc 1986).

The factors in determining the propriety of the amount of a punitive damage award include the degree of reprehensibility of the defendant's conduct, the relationship between actual and punitive damages, and the difference between the award and any civil penalties authorized or imposed in comparable cases. *BMW of N. Am., Inc. v. Gore,* 517 U.S. 559, 575, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). Missouri's additional factors include: (1) aggravating and mitigating circumstances of defendant's conduct; (2) degree of malice or outrageousness of defendant's conduct; (3) defendant's character, financial worth, and affluence; (4) age, health, and character of injured party; (5) nature of the injury; (6) awards in comparable cases; and (7) superior opportunity for the jury and the trial court to appraise the plaintiffs injuries and other damages. *Letz,* 975 S.W.2d at 178.

An abuse of discretion in a punitive damage award results when an appellate court determines the award shows "improper motives or a clear absence of the honest exercise of judgment." *Id.* at 174–75 (quoting *Call v. Heard,* 925 S.W.2d 840, 849 (Mo. banc 1996)). There is no bright line test for determining whether or not the punitive award is grossly excessive so as to be obviously disproportionate to the injury shown, where such award may be the result of anger or sorrow. *Barnett,* 963 S.W.2d at 661–62.

The degree of reprehensibility of a defendant's conduct is, perhaps, the most

important indicium of the reasonableness of a punitive damages award. *BMW,* 517 U.S. at 575, 116 S.Ct. 1589. The majority states that Peters failed to prove GM's actual knowledge. However, in viewing the facts in the light most favorable to the judgment, there was substantial evidence for the jury to find that GM knew of the propensity of cruise control malfunction resulting in sudden acceleration. Four different GM engineers testified at on behalf of Ms. Peters. One acknowledged that GM knew of the likelihood of a defect in the early 1980s; and certainly subsequent to a study performed by GM in 1988, GM knew that there was a potential for electrical faults in the cruise control system. Instead of recalling the part, this particular engineer and GM decided that the appropriate course of action was to redesign the system. Another engineer, who was head of the Cruise Control Center of Expertise, testified that during a study in 1992 he found that an electrical fault could actuate the throttle on the current cruise control model. Yet, when he recommended that GM adopt a new system, with additional security measures, he received a great deal of opposition from GM executives and the security objectives were never adopted.

A third engineer testified that GM has been using the recommended stepper-motor system in some of its vehicles since 1988, a system which has better standards for cruise control security than the three-mode cruise control system then used that was known to uncontrollably accelerate. But not until 1994 (the car in question was manufactured in 1993) did GM begin using the stepper-motor cruise control system in the Oldsmobile Cutlass (Peters' car). Moreover, there was evidence that GM's motive not to repair/replace the part was influenced by a desire to save money. A fourth engineer testified that the Cutlass

was the lead vehicle in a project created by GM to cut $1,800 worth of cost off each vehicle production. The potential cost for eliminating the current cruise control and replacing it with the more secure system was $12–$21 million plus engineering costs. Additionally, there were seventy-four properly admitted customer complaints introduced at trial, involving sudden acceleration incidents in W cars. Even though this is a close call, there was sufficient evidence to submit punitive liability to the jury.

### B. Amount of Punitive Damages

The jury award here was $50 million. Because punitive damages are extraordinary and harsh, "clear and convincing" evidence is required to prove such damages. *Rodriguez*, 936 S.W.2d at 111. Based on the factors to be considered in remitting the jury's punitive award on the basis of excessiveness as outlined in this court's cases of *Letz*, 975 S.W.2d at 177–79, and *Barnett*, 963 S.W.2d at 661–67, and based on the *de novo* review, *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 440 n. 14, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001), the jury amount is excessive. The punitive awards of the *Letz* and *Barnett* cases, which were each remitted on appeal to $26.5 million, were based on much more egregious conduct than by this defendant.

Wealth of the defendant is indeed a factor in determining punitive damages, but not the sole justification for punitive damages. *BMW*, 517 U.S. at 585, 116 S.Ct. 1589. Therefore, I would remit the amount of punitive damages to $5 million.

### C. Instructional Error

GM asserts that the trial court erred by submitting two separate instructions on punitive damages, MAI 10.02 (negligence) and MAI 10.05 (strict liability-both product defect and failure to warn) instead of just one, MAI 10.06 (both negligence and strict liability submitted). The Notes on Use for 10.06 state that this instruction is the appropriate punitive instruction where negligence and strict liability claims are both submitted.

The Notes on Use are given the same mandatory effect as the instructions themselves, *Roth v. Atchison, Topeka & Santa Fe Ry. Co.*, 912 S.W.2d 583, 591 (Mo.App. 1995). Suffice it to say, 10.06 should have been submitted. If there is an applicable MAI, it shall be given to the exclusion of all others. *Id.* "Failure to follow MAI is error, with the prejudicial effect of the error subject to judicial assessment. Rule 70.02(b). It is not enough to show erroneous deviation unless prejudice also appears." *Chase Third Century Leasing Co. v. Williams*, 782 S.W.2d 408, 413 (Mo.App. 1989) (citing *Hudson v. Carr*, 668 S.W.2d 68, 71 (Mo. banc 1984)). Submission of multiple instructions in violation of express MAI instructions constitutes error, and is presumed prejudicially erroneous unless it is made "perfectly clear" that no prejudice has resulted from the repetitive instructions. *Beers v. W. Auto Supply Co.*, 646 S.W.2d 812, 815 (Mo.App.1982); *Royal Indem. Co. v. Schneider*, 485 S.W.2d 452, 458 (Mo.App.1972); *Gormly v. Johnson*, 451 S.W.2d 45, 47 (Mo.1970).

What makes this situation unique is that the instructions submitted, MAI 10.02 and MAI 10.05, were not modified in any way. No essential element was left out. *E.A.U., Inc. v. R. Webbe Corp.*, 794 S.W.2d 679, 688 (Mo.App.1990). The direction to the jury was the same, except given in two instructions rather than one. The strict mandatory language of following MAI and submitting only the preferred single instruction would necessitate a new trial on the issue of punitive damages but not for the jury rendering a verdict for $20 and

$10 million in respective compensatory awards.

Here, GM had notice of the three-mode cruise control system's propensity to suddenly accelerate, yet delayed implementing the stepper-motor system in its W cars for several years despite the recommendation of its own engineers and the receipt of numerous customer complaints. Based on this evidence, it is hard to divine any prejudice from them submitting two instructions on punitives, when such a large sum had already been assessed in determining actual damages. This court should not presume the incorrect submission led to the punitive verdict, or its size.

### D. PREJUDGMENT INTEREST

Calculation of prejudgment interest is governed by Section 408.040:

> In tort actions, if a claimant has made a demand for payment of a claim or an offer of settlement of a claim, to the party, parties or their representatives and the amount of the judgment or order exceeds the demand for payment or offer of settlement, prejudgment interest, at the rate specified in subsection 1 of this section, shall be calculated from a date sixty days after the demand or offer was made, or from the date the demand or offer was rejected without counter offer, whichever is earlier.

§ 408.040.2. Subsection one sets the rate of prejudgment interest at nine percent per annum. § 408.040.1.

In this case, Peters made a settlement demand on July 24, 2002. Therefore, interest should be calculated sixty days from this date—September 22, 2002—until the date of the trial court's entry of judgment,

January 7, 2003, 107 days later. Peters does not dispute that the award should be offset by the $25,000 settlement with Moffett's Auto Works. At a rate of nine percent per year, the prejudgment interest on Mrs. Peters' $9.975 million award ($10 million less the $25,000 settlement amount) and Peters' loss of consortium award of $2 million should be $263,176.03 and $52,767.12, respectively.

Regarding punitive damages, at the time of the judgment, prejudgment interest was not permitted and, therefore, could not be awarded on appeal.[1]

### II. CONCLUSION

I dissent from the majority opinion in that I would hold that the testimonies of the seven witness' accidents involving sudden acceleration are sufficiently similar to be admitted, and I disagree that this court can even review the exclusion of GM's rebuttal evidence because this court was not provided with Dr. Moffatt's deposition transcript.

I would hold that a submissible case was made on compensatory damages and on punitive damages, and finding no error, whether singly or in combination, which requires reversal, and having determined the damages in the judgment are excessive, I would affirm if Peters accepts remittitur. As this court said in *Letz*, 975 S.W.2d at 180, an appellate court may not compel remittitur but can give the plaintiff the opportunity to remit to a certain amount or accept the burden and expense of a new trial. Pursuant to remittitur, I would set the amount of $10 million on compensatory damages, $2 million on loss of consortium, and $5 million for punitive

---

1. Since then, however, the Supreme Court has held that prejudgment interest may be awarded for punitive damages. *Werremeyer v. K.C. Auto Salvage Co.*, 134 S.W.3d 633, 636–37 (Mo. banc 2004). Because prejudgment interest is a procedural rule of law, subsequent changes by judicial opinion do not have a retroactive effect. *Prayson v. Kansas City Power & Light*, 847 S.W.2d 852, 855 (Mo.App. 1992).

damages. I find no prejudicial error occurred by submitting two punitive instructions, rather than the one mandated by MAI. Finally, I would reverse that portion of the judgment dealing with prejudgment interest and remand for computation.