**Shirley BODIMER, Plaintiff/Appellant,**

v.

**RYAN'S FAMILY STEAKHOUSES, INC., Defendant/Respondent.**

No. 73185.

Missouri Court of Appeals,
Eastern District,
Division Four.

Aug. 18, 1998.

Motion for Rehearing and/or Transfer to Supreme Court Denied Oct. 26, 1998.

Robert J. Albair, Clayton, for Plaintiff/Appellant.

Terese A. Drew, Asim S. Raza, Hinshaw & Culbertson, St. Louis, for Defendant/Respondent.

SIMON, Judge.

Shirley Bodimer, plaintiff, appeals from an order of the trial court granting defendant, Ryan's Family Steakhouses, Inc.'s, Motion for New Trial, as to damages only in favor of defendant, unless plaintiff agrees to a remittitur of $240,000.00 on a jury verdict and judgment awarding plaintiff $440,000.00 in damages.

On appeal, plaintiff contends that the trial court abused its discretion in: (1) granting remittitur by concluding that the damages were excessive and not supported by the evidence; (2) finding that the jury's verdict was excessive and exceeded fair and reasonable compensation for plaintiff's injuries and damages, in that the verdict was not manifestly unjust or so grossly excessive such that it could shock the conscience of the court so as to authorize a remittitur; (3) granting a remittitur by relying on court selected cases involving fractured hips as being representative of prevailing awards, in that the cases cited by the court were chosen arbitrarily, were mostly antiquated, most were decided in other states, many did not represent verdicts rendered in large urban court systems similar to St. Louis, most are factually distinguishable and there are numerous jury verdicts that the court did not cite which would support the jury's award as being fair and reasonable compensation under the facts and evidence in this case; (4) granting of remittitur because it deprived plaintiff of a fair trial by jury as guaranteed by the Missouri Constitution, in that the trial court unreasonably and arbitrarily ignored the weight of the evidence and substituted its judgment for that of the twelve jurors as to the value of plaintiff's personal injury claim; and further the trial court erred in (5) granting a new trial as to damages only unless plaintiff agreed to remittitur because the trial court made no finding of fact that some error or misconduct occurred during the trial or that the award was a result of jury bias or was glaringly unwarranted so as to shock the conscience of the court so as to allow for a new trial, or bias was present in the trial in favor of plaintiff; and (6) entering an order of remittitur because Section 537.068 RSMo 1994 (all further references shall be to RSMo 1994 unless otherwise noted) was enacted as part of House Bill 700, 84th General Assembly, 1987, and said Bill is unconstitutional in that it violates article 3, Section 23 of the Missouri Constitution, and said Bill violates the generality of title requirement. We reverse and remand with directions.

The record viewed in the light most favorable to the verdict reveals that on January 28, 1994, Debbie Wilson, plaintiff's niece, suggested that they go to defendant for dinner. Plaintiff and Wilson drove separate cars. Defendant is located on the north side of Watson Road. Its parking lot is situated on the west side of the property and sloped downhill from the restaurant to the west. There were no barricades or warning signs regarding ice or prohibiting parking on certain areas of the lot.

Weather records indicate that there was a sizeable snow fall approximately twelve days prior to January 28. The record also reveals that the snow on defendant's lot was plowed into piles on various portions of the lot by a snow removal company, West County Supervac. For several days prior to January 28,

there was a thaw. The snow piles began to melt and some of the runoff traveled downhill across the parking lot towards the drainage sewers at the bottom of the lot. At times the runoff refroze into patches of ice. On January 28, the temperature dipped below freezing at approximately 3:00 a.m. and remained below freezing throughout the day and into the evening.

Both plaintiff and Wilson arrived at the restaurant between 6:30 p.m. and 7:00 p.m. Wilson parked her car in the center of the lot, and plaintiff parked her car on the northern edge. As plaintiff was walking towards Wilson's vehicle, she observed what she thought was a patch of water on the parking lot, but it was actually ice. As she walked across the patch, plaintiff slipped and fell. She felt intense pain in her groin area, the upper part of her left leg and her hip. Plaintiff called to Wilson for assistance and Wilson went to the restaurant to obtain help. A patron of defendant and a fireman, provided assistance, and also slipped on the patch of ice. Defendant's manager, Jim Larson, and plaintiff both stated that they did not know the patch was ice until they stepped on it and found it was slick.

Larson admitted that the ice patch posed a safety hazard for customers. The parking lot was admittedly a means of ingress and egress to the restaurant, and it constituted a "walking surface" as stated by Plaintiff's safety expert, defendant's managers and provided in defendant's written policy and procedures for maintaining the lot. Defendant was responsible for maintaining the parking lot, removing snow and ice, salting and monitoring the condition of the lot. Defendant's managers did not know when the lot had last been monitored by any of the 40 employees or managers, and to their knowledge, no one had checked for ice, refreezing or runoff on the date in question. Their normal policy was to wait for customers to report ice on the lot before they try to remedy the condition.

Plaintiff was taken by ambulance to St. Joseph's Hospital in Kirkwood. X-rays revealed a fracture of her left hip. She was treated by Dr. David Stronsky, an orthopedic surgeon, who testified that it was a painful injury. He recommended surgery to repair the fracture and on the following day he performed a "hip nailing" procedure, which lasted two hours and involved the placement of metal screws and a metal plate which was attached to the femoral shaft of plaintiff's left leg.

Following the operation, plaintiff had a special pair of stockings, called Ted Hose, placed on her legs and attached to a pump in order to increase the circulation of blood. Plaintiff experienced a post-surgical fever, poor sleep, and intense post-surgical pain which required the administration of pain medication on more than two dozen occasions. Plaintiff also experienced a painful spinal headache from the epidural anesthetic, which caused cold sweats, nausea and vomiting for several days. On February 4, 1994, plaintiff was taken back to the operating room and an epidural blood patch was applied under anesthesia to relieve the side affects of the epidural anesthetic.

Plaintiff had a limited amount of therapy while at the hospital due to spinal headaches and the requirement of early discharge. She was released after 10 days on February 8, 1994. She was given pain medications and instructed to perform home exercises in order to increase movement in her legs.

When plaintiff arrived home she was bedridden. She was assisted by her elder son, who cooked and cleaned for her, helped her bathe and dress, and administered her medication. Plaintiff testified that this was embarrassing for her. She utilized a wheelchair for approximately two weeks, a walker for another six to eight weeks, then progressed to a pronged cane for a period of time until she could use a normal cane. Plaintiff performed the prescribed exercises, but they were painful.

Plaintiff's first post-op visit to Dr. Stronsky was February 14. At that time, the injury appeared to be healing well. Dr. Stronsky removed the surgical staples. X-rays of plaintiff's hip looked good and she was advised to use a walker while putting as much weight on the leg as possible. Plaintiff next visited Dr. Stronsky on April 25. At that time, plaintiff had a limp. Dr. Stronsky recommended Advil for the pain. Plaintiff's

final post-op visit was September 1994, at which time Dr. Stronsky believed plaintiff was doing well.

During the three years following her injury, she was unable to bend over or perform various household chores. She testified that she still uses a cane to walk uphill, use steps, walk on uneven ground, or when she is required to walk for an extended period. She also testified that sitting for too long hurts her hip and back. Certain activities are difficult and painful for her, such as getting in and out of her van or seating herself. Plaintiff has never had any prior left hip pain, problems or injuries, and she has not had any subsequent injuries. Rainy weather now causes more pain. Over the last couple of years her pain and limp have increased and become chronic. She now takes showers and baths to help soothe the pain and takes up to twelve Advil per day to relieve the pain. Dr. Stronsky testified that plaintiff's pain will be permanent and her limitations of normal life, such as chores, climbing, stooping and bending will be permanent.

Plaintiff returned to Dr. Stronsky in May 1997. Dr. Stronsky observed a "substantial limp" which was "considerably worse" than during her last visit in September 1994. He observed that she was using a cane and had difficulty sitting down and standing up due to the left hip. Plaintiff complained of increased pain and increased use of anti-inflammatory pain medication. X-rays were taken, confirming the presence of avascular necrosis, a degenerative condition, in her left hip joint, which he testified was caused by the original fall on the ice in 1994. He also testified that her condition had worsened since September 1994. Dr. Stronsky told plaintiff that her options were to deal with the increasing pain and disability, or to follow his recommendation and undergo a total hip replacement. Dr. Stronsky testified that plaintiff will probably benefit from this operation.

The hip replacement will be performed under general anesthesia and involves the possibility of infection, antibiotic reactions, blood loss, the possibility of blood clots, and hemorrhaging. Plaintiff will experience pain during the postoperative period. There is also the possibility that the hip may pop out of the socket, which will require another procedure under anesthetic to reposition the joint and may result in the lengthening or shortening of her leg. After surgery, plaintiff will require three weeks in a skilled nursing facility before going home. Her recuperation will probably involve the use of a walker for twelve weeks, then a cane as needed.

Based on statutory mortality tables, plaintiff can be expected to live an additional 24.56 years. Her medical bills for the "hip nailing" surgery were $17,833.29. Her use of Advil for three years cost an estimated $188.00. Dr. Stronsky's office visit of May 5, 1997 was $142.00. Plaintiff's future medical expenses for the hip replacement operation, not including the cost of skilled nursing and physical therapy, is estimated to be $21,000.00. Her total past and future medical expenses approximate $39,163.29.

Trial began on July 28, 1997. In closing argument plaintiff requested compensatory damages between $340,000.00 and $440,000.00. On August 1, 1997, the jury rendered a verdict awarding plaintiff $440,000.00 in damages. The trial court entered judgment on the verdict for $440,000.00 plus prejudgment interest in the amount of $117,285.25, for a total judgment in the amount of $557,285.25. Defendant filed Motions for New Trial and Remittitur alleging, among other things, that the verdict was excessive based on the evidence. On August 28, 1997, the trial court granted defendant's Motion for Remittitur, or in the alternative granted defendant's Motion for New Trial if plaintiff did not agree to a remittitur reducing the verdict to $200,000 plus prejudgment interest in the amount of $36,737.70 and post-judgment interest at the rate of 9% per annum The trial court's order provided in pertinent part:

Defendant's motions for remittitur and for new trial were heard and submitted on August 26, 1997. The court now rules that the motion for remittitur is granted, and that the new trial motion is granted in the alternative, as set forth below.

\* \* \*

Plaintiff made no claim for loss of wages, and the evidence showed that she did not require any specialized medical equipment such as a cane or wheelchair, and that she was not taking any prescription medication.

\* \* \*

The court has considered the damages awarded here in light of the evidence at trial and has considered jury verdicts in other cases involving broken or fractured hips, and finds that the damages are excessive and are not supported by the evidence. The court bases its findings on the lack of any loss of earnings and the serious and disabling permanent injuries.

\* \* \*

THEREFORE, the court orders that the motion of defendant for new trial is GRANTED as to damages only, unless plaintiff agrees to a remittitur in the total amount of $320,547.55, leaving a judgment in the amount of $236,737.70 plus post-judgment interest.

Plaintiff refused remittitur, the trial judge did not enter a new damage award in accordance with the remittitur. This appeal followed.

The parties characterize this appeal as one from a grant of remittitur. However, since plaintiff did not accept remittitur and no new damage award was entered, a new trial as to damages only was granted pursuant to the trial court's order. Thus, the dispositive issue is the propriety of the trial court's grant of a new trial as to damages only. Therefore, we shall initially address plaintiff's fifth point. Plaintiff contends that the trial court erred in granting a new trial as to damages only unless plaintiff agreed to remittitur because the trial court made no finding of fact that some error or misconduct occurred during the trial or that the award was a result of jury bias or was glaringly unwarranted so as to shock the conscience of the court and allow for a new trial, or the presence of bias was present in the trial in favor of plaintiff. Defendant contends that the trial court properly granted a new trial because there was substantial evidence presented that plaintiff's injuries were of neither the duration nor severity warranting the jury's verdict of $440,000.00.

Appellate courts should be more liberal in upholding a grant of a new trial than in awarding a new trial when the trial court denies the motion. *Simpson v. Kansas City Connecting Railroad Company*, 312 S.W.2d 113 (Mo. banc 1958), cert. denied, 358 U.S. 825, 79 S.Ct. 41, 3 L.Ed.2d 65. However, when reviewing the grant of a motion for a new trial after a verdict in favor of the plaintiff, plaintiff is entitled to have the evidence and all reasonable inferences deducible therefrom, viewed in the light most favorable to her. *Luyties Pharmacal Co. v. Frederic Co., Inc.*, 716 S.W.2d 831, 833 (Mo.App.1986). Our review is directed to whether the trial court abused its discretion in ordering a new trial. An abuse of discretion has been defined as, "a judicial act which is untenable and clearly against reason and which works an injustice." *State v. Stubenrouch*, 499 S.W.2d 824, 826 (Mo.App.1973).

Here, the judge and jury had the opportunity to view plaintiff at trial and to assess plaintiff's injuries and other damages in light of the evidence presented. The jury awarded plaintiff $440,000.00, and the trial court subsequently granted defendant's Motion for New Trial as to damages only, unless plaintiff agreed to remittitur reducing verdict to $200,000.00. The record indicates that the trial court found that the damages awarded to plaintiff were excessive and not supported by the evidence. The trial court also found that plaintiff made no claim for loss of wages, and the evidence showed that she did not require any specialized medical equipment such as a cane or wheelchair, and that she was not taking any prescription medication. The trial court based its grant of a new trial on its finding of lack of any loss of earnings and serious and disabling permanent injuries.

The trial court's finding that plaintiff did not require any specialized medical equipment such as a cane or wheelchair, and that she was not taking any prescription medication is not supported by the evidence.

The record clearly indicates that plaintiff required the use of a wheelchair and a walker after her initial hip-nailing operation and that she still uses a cane. Dr. Stronsky also testified that plaintiff will require the use of a wheelchair and walker during her recovery from the hip replacement operation. In addition, although plaintiff is not taking prescription medication, she is taking up to twelve Advil per day to cope with her pain.

Further, plaintiff was a 58 year-old woman, who was unemployed at the time of her injury. Though she was hospitalized for ten days, bedridden for a period of time, used a wheelchair for two weeks, a walker for another six weeks and a cane, she did not suffer any loss of income because she was unemployed. Therefore, in this situation, loss of earnings is not an essential factor in the determination of her damages.

Further, though her hip fracture healed, plaintiff continued to limp and use a cane and subsequently developed avascular necrosis, a degenerative condition, in her hip joint as a result of the fracture. The evidence clearly indicates that the fracture and the degenerative condition are serious and disabling and, unless plaintiff desires to live with the pain, the only available remedy is total hip replacement, which is a painful operation involving many risks, including the lengthening or shortening of the leg. Further, Dr. Stronsky testified that plaintiff's pain will be permanent and that her limitations of normal life, such as chores, climbing, stooping and bending will be permanent. The record indicates that plaintiff has a life expectancy of an additional 24.56 years during which time she will suffer from her injury. Considering the evidence and all reasonable inferences deducible therefrom, viewed in the light most favorable to plaintiff, we find sufficient evidence to support the verdict and judgment.

Further, the record indicates that the basis of the trial court's order granting a new trial was, in reality, the excessiveness of the verdict in relation to what the trial court perceived as the evidence. In Missouri, there are generally two situations in which an appeal of an excessive verdict arises: (1) where the verdict is simply disproportionate to the proof of injury and results from an honest mistake by the jury in assessment of the evidence and, (2) where the verdict's excessiveness is engendered by trial error or misconduct and thus results from the bias and prejudice of the jury. A verdict in the first instance may be corrected by an enforced remittitur and does not require a retrial. A verdict of the second variety is prejudice and can only be remedied with a new trial. *Barnett v. La Societe Anonyme Turbomeca France*, 963 S.W.2d 639, 656 (Mo. App.1998). A new trial is only available upon showing that trial error indicated prejudice in the jury, and the amount of verdict by itself is not enough to establish that verdict was result of bias, passion and prejudice. *Larabee v. Washington*, 793 S.W.2d 357, 359 (Mo.App.1990). The trial court erred in granting a new trial as to damages only because the record does not indicate trial error or misconduct. Therefore, the judgment as to the new trial is reversed and remanded with directions to the trial court to enter judgment in accordance with the jury's verdict.

Plaintiff's first three points on appeal are related, in that they all address the alleged abuse of discretion by the trial court in reducing the damage award. In her fourth point, plaintiff contends that the trial court abused its discretion because its grant of remittitur deprived plaintiff of a fair trial by jury as guaranteed by the Missouri Constitution. In her sixth point, plaintiff contends the trial court's order granting remittitur was improper because Section 537.068 was enacted as part of House Bill 700, 84th General Assembly, 1987, and said Bill is unconstitutional in that it violates article 3, Section 23 of the Missouri Constitution, and said Bill violates the generality of title requirement. Due to the disposition of point five, we will not address plaintiff's points.

JUDGMENT REVERSED WITH DIRECTIONS.

ROBERT G. DOWD, Jr., P.J., and HOFF, J., concur.