Angela MARTIN, et al., Respondents,

v.

**SURVIVAIR RESPIRATORS, INC., et al., Appellants.**

**No. ED 90885.**

Missouri Court of Appeals, Eastern District, Division Four.

Aug. 4, 2009.

Motion for Rehearing and/or Transfer to Supreme Court Denied Sept. 14, 2009.

Application for Transfer Denied Dec. 22, 2009.

Thomas Michael Ward, James L. Stockberger, St. Louis, MO, Lynn W. Hursh, Kansas City, MO, for appellants.

Jerome J. Schlichter, St. Louis, MO, for Respondents Angela Martin, J.M. and D.M.

Stacy Rosa Hancock, St. Louis, MO, for Respondent Joyce Martin.

Donald L. Schlapprizzi, St. Louis, MO, for Respondent Lonnie Sides.

KENNETH M. ROMINES, Judge.

### Introduction

This is a products liability wrongful death case. Derek Martin, a firefighter, died trying to rescue a fellow firefighter who was lost inside a burning building. Martin's family sued the manufacturers of the firefighters' equipment, Survivair Respirators, Inc. ("Survivair") because of alleged malfunctioning of equipment that contributed to Martin's death. The jury returned a verdict in favor of Martin's family ("the family") for $12 million in compensatory damages and $15 million in aggravating circumstances damages. Survivair appeals. Martin's family cross-appeals, arguing the trial court improperly allocated the verdict among Martin's surviving family members. Because we agree that the evidence supports the verdict and the allocation of damages, we affirm.

### Factual and Procedural Background

Firefighters Derek Martin and Robert Morrison were members of the St. Louis Fire Department Rescue Squad One. On 3 May 2002, Rescue Squad One responded to a fire occurring at the Gravois Refrigeration Building, a two-story commercial structure. When they arrived on scene, they determined that the fire was nearly

extinguished. The next step was to ventilate the building in order to allow smoke to escape and increase visibility. This required the firefighters to enter the second floor of the building and knock out windows.

Each firefighter was outfitted with a range of equipment, including an air tank, a face mask, and a PASS alarm. The air tanks contained enough air to sustain breathing for thirty minutes. The face masks had valves which expelled air that the firefighters exhaled. The PASS alarms were designed to activate and emit a loud screeching sound anytime they were motionless for a period of twenty seconds or more. The firefighters could also manually activate their PASS alarms.

Morrison was one of the firefighters who entered the second floor to ventilate the building. Within five minutes of entry, the situation changed dramatically for the worse. The fire flared up again, fueled by a then unidentified gas leak. Captain Dieters, a firefighter from another squad, called over the radio for help because he had become trapped on the first floor of the building. He was ultimately able to escape with help; but because of this, the squad issued an evacuation order and sounded the horns on the fire trucks to let the firefighters know they were to evacuate the building.

At that time, Kenneth Walters was making his way around the second floor of the building, trying to find an exit. As he was searching in one of the rooms, he heard a call for help nearby and went to assist that firefighter, who he later learned was Morrison. Walters grabbed Morrison's coat to lead him out of the fire. As they moved along, Walters realized he had lost his way, and he dropped Morrison's arm to try to feel along the walls with both hands and find an exit. He then realized that Morrison had not followed him and that they were separated. Walters said he did not hear Morrison's PASS alarm sound at any time. Walters felt very disoriented and continued searching for an exit, only to run back into Morrison, who at that point was lying face down and motionless. Walters tried to move him unsuccessfully, not knowing where they were or which way to move him. At that point Walters heard a bell that was his low-air alert, signifying that the air tank he was wearing was almost empty. Walters called for help over his radio and did not hear any response. At that point Walters decided to continue searching for an exit. He finally found a hose, which he followed to the stairs. He tumbled down the stairs and made his way to the exit.

Walters informed the firefighters waiting outside that Morrison was still inside and was not moving. Some firefighters went in immediately to rescue Morrison; and others, including Martin, refilled their air tanks before joining the rescue effort. None of the firefighters heard Morrison's PASS alarm at any time. Two minutes after Martin entered the second floor looking for Morrison, he radioed a "mayday" distress call: the most serious call for help. Martin continued making distress calls over the next eight minutes, during which time another firefighter told him to activate his PASS alarm. Firefighters reentered the building, searching now for both Martin and Morrison.

Firefighter Mark Nagl located Morrison on the second floor lying face down and not moving. Nagl testified he did not hear Morrison's PASS alarm sound. Nagl and Firefighter Guy Jennings carried Morrison outside and sent him immediately to the hospital because he was not breathing and had no pulse. Morrison was pronounced dead at the hospital.

The search for Martin continued. Firefighter John Hernandez searched the sec-

ond floor, and he could hear Martin's PASS alarm. It was difficult to locate Martin because the sound bounced off of the walls, but Hernandez did eventually find Martin. Martin was no longer wearing his face mask or his gloves. Hernandez dragged Martin to a window and got him out of the building with help from others on the ground. Others tried to resuscitate Martin to no avail. He ultimately died of smoke inhalation.

Martin's family ("the family") sued Survivair, claiming that both Morrison's PASS alarm and Martin's face mask malfunctioned and contributed to Martin's death. At trial, the family produced evidence of PASS alarm failures due to water infiltration. They also showed that tests of Morrison's PASS device conducted after the fire showed a leak that would allow water to infiltrate the electronics. The family also produced evidence that face masks could malfunction because of a stuck exhalation valve. If an exhalation valve became stuck, the firefighter would not be able to breathe through the mask. Other firefighters testified that sometimes stuck valves could be cleared simply by blowing forcefully through them. However, if an exhalation valve could not be cleared that way, then one would have to remove his or her gloves and face mask to clear the valve. The evidence also showed that Martin's exhalation valve was stuck when it was tested a few days after the fire. Finally, the family produced evidence that Survivair was aware of these problems from reports of various fire departments across the United States.

The family submitted their claims under both strict liability and negligence theories. They argued that both the malfunctioning of Morrison's PASS alarm and that of Martin's face mask contributed to cause Martin's death. The jury returned a verdict of $12 million in compensatory damages, and $15 million in damages for aggravating circumstances. The trial court later allocated the damages among Martin's family members, giving 49.5% to Martin's wife, 12.5% each to Martin's three children and Martin's mother, and 0.5% to Martin's father.

Survivair raises six points on appeal: (1) whether the family made a submissible case that Martin's exhalation valve was stuck and contributed to Martin's death; (2) whether the family made a submissible case that Morrison's PASS alarm failed and contributed to Martin's death; (3) whether the trial court erred in allowing other firefighters to testify to other incidents of equipment failure; (4) whether the compensatory damage award was excessive and shocks the conscience; (5) whether the evidence was sufficient to submit a request for punitive damages; and (6) whether the trial court abused its discretion in denying remittitur of punitive damages. The family raises one point in its cross-appeal: whether the trial court improperly allocated damages by awarding 12.5% to Martin's mother. We discuss each in the most logical order.[1]

### *Submissibility*

#### *Standard of Review*

Whether the family made a submissible case is a question of law that we review *de novo*. *See Feiteira v. Clark Equipment Co.*, 236 S.W.3d 54, 59 (Mo. App. E.D.2007) (wrongful death); *Drury v. Mo. Youth Soccer Ass'n, Inc.*, 259 S.W.3d 558, 573 (Mo.App. E.D.2008) (punitive damages). We ask whether the family

---

1. The family filed a motion to dismiss Survivair's opening brief for failure to comply with Rule 84.04, and Martin's mother filed a motion to dismiss the family's cross-appeal for failure to comply with Rule 84.04 as well. Both motions are denied.

established by substantial evidence every element of the cause of action, viewing the evidence in the light most favorable to the family. *See id.* Similarly, when reviewing the submissibility of a request for punitive damages,[2] we view the evidence in the light most favorable to submissibility and disregard all adverse evidence and inferences. *Drury*, 259 S.W.3d at 573.

### Face Mask

Survivair's first point on appeal is that the family did not make a submissible case as to whether Martin's face mask caused Martin's death. Survivair disputes that there was sufficient evidence that the exhalation valve was actually stuck during the fire, and they argue that this defeats both the family's claim of strict liability and their claim of negligence.

### 1. Strict Liability

■ There are two possible theories for strict liability contained in § 537.760 RSMo. (2000).[3] One theory is based on product defect (either design or manufacturing); and the other is based on failure to warn. The first requires the jury to find that the product when sold was then in a defective condition unreasonably dangerous when put to a reasonably anticipated use. The second requires the jury similarly to find that the product was in an unreasonably dangerous condition, and that the manufacturer did not give an adequate warning of the danger. § 537.760. The jury here was instructed on both bases of strict liability. Survivair argues

against any finding that the condition of the face piece was unreasonably dangerous when sold, which would defeat both bases. Survivair claims that the evidence concerning Martin's exhalation valve becoming stuck during the fire was all circumstantial and thus conjectural. We disagree.

■ Circumstantial evidence may be sufficiently relied on to support a verdict in a products liability case. *Peters v. Gen. Motors Corp.*, 200 S.W.3d 1, 18 (Mo.App. W.D.2006). However, this evidence must infer the conclusion without resort to conjecture and speculation. *Id.* The evidence must tend to exclude any other reasonable conclusion, such that if an equally plausible conclusion exists, then the evidence was not sufficient to make a submissible case. *Id.* The plaintiff does not have to exclude *all* other possibilities nor does he or she have to present undisputed evidence to make his or her case submissible. *See id.*

First, Survivair attacks the family's expert testimony.[4] The expert, Norman Johanson, testified that he performed experiments on similar equipment, which even included modifications to the face mask that would allow the valve to be cleared more easily without removing the face mask. He reviewed records of other incidents of stuck face mask valves, and he reviewed documents and deposition testimony of those who had experienced stuck valves. He concluded that there was no reason for Martin to remove his mask and

---

**2.** Damages for aggravating circumstances in wrongful death cases are governed by the same standards as punitive damages. *Call v. Heard*, 925 S.W.2d 840, 851 (Mo. banc 1996). We will use the terms interchangeably here.

**3.** All statutory references are to RSMo. (2000) unless otherwise indicated.

**4.** Here Survivair attacks the testimony as based purely on speculation. This argument

suggests that the court abused its discretion in admitting Johanson's testimony, but Survivair did not raise this as a point on appeal, nor mention it in this point relied on. Therefore we do not address the admissibility of Johanson's testimony. *See Chancellor Devel. Co. v. Brand*, 896 S.W.2d 672, 678 (Mo.App. E.D. 1995).

gloves unless it was in order to clear his exhalation valve.

Furthermore, the family presented evidence from other firefighters that their valves had become stuck during fires. Those firefighters stated that if blowing through the mask did not clear the valve, the only way to do so was to take off the mask. Then to unclog the valve, the firefighters would have to remove their gloves. They also testified that there would be no other reason to remove their masks or gloves. Martin was found with both removed. While this evidence is circumstantial, Survivair has presented no other reasonable conclusion to be drawn. There was enough to submit it to the jury, and it was then for the jury to decide whether they believed the evidence and could conclude that Martin's valve, if stuck, constituted an unreasonably dangerous condition.

## 2. Negligence

■■ The difference between a negligence claim and a strict liability claim is that the latter focuses on the product, whereas the former focuses on the conduct of the defendants. *Peters,* 200 S.W.3d at 17 (citing *Blevins v. Cushman Motors,* 551 S.W.2d 602, 607–08 (Mo. banc 1977)). The jury was instructed to make four findings to conclude Survivair had been negligent: (1) that Survivair manufactured Martin's face piece; (2) that Martin's face piece had an exhalation valve which could become stuck while in use; (3) that Survivair failed to use ordinary care to either manufacture the face piece to be reasonably safe or adequately warn of the risk of harm from an exhalation valve which could become stuck while in use; and (4) that such failure directly caused or directly contributed to cause the death of Martin.

Survivair's entire argument is that it required conjecture and speculation to find that Martin's valve became stuck during the fire. As stated above, we believe the evidence was sufficient to submit to the jury the issue of whether the valve was stuck. An affirmative finding on this issue would allow the jury to consider all of the elements above and find Survivair negligent. Survivair does not dispute any of the other elements in its point relied on. Point denied.

### Morrison's PASS Alarm

Survivair's second point relied on is that the family failed to make a submissible case on either strict liability or negligence concerning the failure of Morrison's PASS alarm. Survivair argues that the failure of proof was threefold: (1) that Martin was not the user of Morrison's PASS; (2) that the Fireman's Rule bars the family's claims because Martin died while performing his duties as a firefighter in an emergency situation allegedly created by the failure of Morrison's PASS alarm; and (3) there is no substantial evidence tending to prove causation. We address each in turn.

### 1. User

■ Both the theories of strict liability and of negligence require the jury to find that Martin was a user of the product at issue. Survivair argues that because it was Morrison who was wearing the PASS device, Morrison is the only one who qualifies as its user. We disagree.

Missouri has adopted the rule of strict liability found in the Restatement (Second) of Torts, § 402A. *Keener v. Dayton Elec. Mfg. Co.,* 445 S.W.2d 362, 363 (Mo.1969). According to the Restatement's comment *l,* the rule protects "all ultimate users for which the product is intended.... 'User' includes those who are passively enjoying the benefit of the product ..." This definition of "user" is quite broad, and has been so applied by Missouri courts. *See, e.g.,*

*Giberson v. Ford Motor Co.*, 504 S.W.2d 8 (Mo.1974) (adopting Restatement definition of "user" and applying it to bystanders).

Here, the PASS device has an intended purpose: to sound an alarm when a firefighter has been motionless for a period of twenty seconds.. This is to alert the others in the Rescue Squad that one of their men is down. It is these others who need the alarm in order to find the man who is down. This is exactly what the PASS device was designed to do. Once the alarm sounds, the firefighter wearing the device takes no part in its use, rather it is the others who use the device to find him. Martin, as one of the other firefighters seeking to locate Morrison, relied on Morrison's PASS alarm to sound in order to find him. Thus, Martin was the "ultimate user" of Morrison's PASS alarm.

### 2. Fireman's Rule

The Fireman's Rule states that a fireman who is brought in contact with an emergency situation solely by reason of his status as a fireman and who is injured while performing a fireman's duties may not recover against the person whose ordinary negligence created the emergency. *Krause v. U.S. Truck Co., Inc.*, 787 S.W.2d 708, 711 (Mo. banc 1990). The public policy behind the rule is that firemen are hired and trained to confront dangerous situations affecting the public as a whole; therefore, the cost of their associated injuries should be borne by the public as a whole through workers compensation laws and insurance. *See Gray v. Russell*, 853 S.W.2d 928, 930–31 (Mo. banc 1993). Survivair argues that even if they were negligent concerning the PASS device; if the failure of that device is what caused the emergency, then Survivair cannot be liable because it is part of a firefighter's ordinary duties to rescue individuals in fires. We disagree.

Survivair correctly observes that there is no Missouri case on point, but even the cases they cite from other jurisdictions fail to persuade. *See Mignone v. Fieldcrest Mills*, 556 A.2d 35 (R.I.1989) (manufacturer of electric blanket which malfunctioned and caused fire not liable for injuries to firefighter); *Flowers v. Rock Creek Terrace Ltd. P'ship*, 308 Md. 432, 520 A.2d 361 (1987) (elevator manufacturer not liable for injuries sustained by firefighter who fell through an open elevator shaft while responding to a fire because an open elevator shaft is within the range of anticipated risks associated with fighting a fire); *Brown v. Gen. Elec. Corp.*, 648 F.Supp. 470 (M.D.Ga.1986) (manufacturer of defective coffee maker which caused fire not liable for injuries sustained by firefighter responding to fire). None of these cases involve malfunction of the firefighters' own safety equipment, and two of them involve malfunctioning products which *caused* the fires in each situation.

Here, in contrast, Morrison's PASS device was not the cause of the fire, and it did not create a dangerous situation affecting the public as a whole. His malfunctioning PASS device was not within the range of anticipated risks that accompany fighting a fire. Rather, the PASS was designed to increase the safety of other firefighters like Martin in responding to such dangerous situations, and it failed to do so. Survivair is rightly the only party that should bear the cost for this malfunction. The Fireman's Rule does not apply.

### 3. Causation

Finally, Survivair argues that even if Martin was a user of Morrison's PASS, there was no substantial evidence to show that the failure of Morrison's PASS to sound caused Martin's death.

First, Survivair misunderstands the level of proof required. Their argument, in which they cite no authority, assumes that Morrison's PASS device had to be the direct cause of Martin's death. However, the jury was instructed that they could find Survivair liable under both theories if (assuming they found all other elements) the failure of Morrison's PASS device "directly caused *or directly contributed to cause* the death of Derek Martin." (emphasis added). The emphasized phrase is not part of MAI 24.04 for strict liability, but it is an approved modification found in MAI 19.01. *See Earll v. Consolidated Aluminum Corp.,* 714 S.W.2d 932, 937 (Mo.App. E.D.1986). Thus the family makes a submissible case if it presents substantial evidence showing that the PASS device's failure directly *contributed* to cause Martin's death.

Viewing the evidence in the light most favorable to submissibility, several other firefighters testified that if Morrison's PASS alarm had worked, he would have been located much sooner. The PASS's failure meant that Martin had to be in the fire for much longer than he should have been, causing him to enter a back room further into the fire. The fact that Martin's own face piece also malfunctioned does not necessarily mean that the PASS failure was therefore not a contributing cause.[5] *See Stull v. Fuqua Industries, Inc.,* 906 F.2d 1271, 1277 (8th Cir.1990) (applying Missouri law) (stating that the defect need not be the sole cause of injury). Therefore, there was substantial evidence from which the jury could find that Morrison's PASS device failure directly contributed to cause Martin's death. Point denied.

*Aggravating Circumstances*

■ Survivair's fifth point also relates to submissibility. Here they argue that the family did not meet the standard for submission of aggravating circumstances damages, because the family did not show that Survivair "showed complete indifference to or conscious disregard for the safety of others," and that their conduct was "so egregious that it was tantamount to intentional wrongdoing" because "the natural and probable consequence of the conduct is injury." *Lopez v. Three Rivers Elec. Co-op.,* 26 S.W.3d 151, 160 (Mo. banc 2000).

We disagree. The family presented evidence at trial that Survivair had received complaints from several fire departments about other occurrences of the malfunctions that occurred here. The family also presented evidence at trial that officers of Survivair knew that sticking exhalation valves could be life-threatening if experienced in a fire. Survivair did not issue a warning or a recall concerning the valves and did not intend to do so. There were also internal memos limiting discussion of complaints so that word would not get out to other departments who purchased equipment from Survivair. The evidence the family presented regarding PASS devices was that most, if not all, of the complaints Survivair received had to do with leaks and water infiltration. There were several reported problems of PASS alarms malfunctioning in this way, but Survivair's chief engineer reported to their safety auditors that it was an "isolated occurrence" and that no corrective action must be taken. Survivair officials admitted at various times that both malfunctions

---

5. This is true because it is possible that if Martin had heard Morrison's PASS alarm sound, then he may have located Morrison and helped him out of the building before Martin's own exhalation valve became stuck. In this scenario, the PASS device's malfunction is a "but for" cause. The jury had enough substantial evidence to so find.

at issue could lead to serious injury during a fire, or even death.

We need only decide whether the family presented sufficient evidence to submit the claim to the jury. Survivair argues that the family did not carry its burden of proof. This is a different question. As long as the family presented evidence showing conscious disregard of the safety risks and that the natural and probable consequence of these risks was injury, then it was the role of the jury to decide whether to believe that evidence or to believe Survivair's conflicting evidence. On a review for submissibility alone, we do not enter that territory belonging to the jury. We find that the family offered enough evidence to invite the jury to consider this question, and we stop there. Point denied.

### Testimony of Similar Incidents

Survivair's third point relied on is that the trial court erred in admitting testimony from other firefighters in other jurisdictions concerning problems with their PASS devices and exhalation valves.

### Standard of Review

 We will not disturb the trial court's rulings as to the admissibility of evidence absent an abuse of discretion. *Thornton v. Gray Automotive Parts Co.,* 62 S.W.3d 575, 583 (Mo.App. W.D.2001). A trial court abuses its discretion when its evidentiary ruling is illogical and so unreasonable and arbitrary that it shocks a sense of justice or indicates a lack of careful, deliberate consideration. *Oldaker v. Peters,* 817 S.W.2d 245, 250 (Mo. banc 1991).

### Discussion

 Survivair argues that the trial court abused its discretion in admitting considerable evidence of other incidents of malfunctioning face masks and PASS alarms. Survivair argues this evidence was inadmissible because those incidents were not sufficiently similar.[6] We disagree.

To determine whether an incident is sufficiently similar, a trial court must determine whether the incident (1) is of like character; (2) occurred under substantially the same circumstances; and (3) resulted from the same cause as alleged to have caused the accident in question. *Peters,* 200 S.W.3d at 10. Here, the family called several witnesses to testify that they had malfunctioning face masks or PASS alarms and that they had notified Survivair of these incidents. The trial court allowed some of this testimony and excluded some of it. Survivair claims that cause is the crucial factor and points to *Peters.* There, the judgment was reversed because though the lawsuit concerned defective cruise control, the evidence at issue concerned unwanted acceleration incidents that could have been caused by any number of things. 200 S.W.3d at 10. This is not the case here. The evidence of malfunctioning face masks all concerned defective exhalation valves that became stuck. The evidence concerning PASS alarms concerned alarms that malfunctioned due to water infiltration.

Survivair argues that these incidents often did not involve serious injury or death, but the outcome is not the issue. The issue is whether the equipment was malfunctioning in the way it was here, and

---

**6.** We note that the family's response to this point was that Survivair did not preserve it for appeal. However, the record includes objections raised in a motion for summary judgment, a pre-trial motion in limine, a continuing objection at trial, and a motion for new trial. We conclude Survivair preserved this argument.

whether Survivair knew about it. Though it is fortunate that such malfunctions did not cause death in every instance, that fact does not relieve Survivair of liability. After reviewing the trial court's decisions in admitting evidence of these incidents, we are simply not convinced that the trial court abused its discretion. Point denied.

## Damages

Survivair's two remaining points attack the damage awards. Survivair argues in point four that the compensatory damage award is grossly excessive; and in point six that the aggravating circumstances award is grossly disproportionate to the compensatory damage award and should therefore be reversed.

## Standard of Review

■ In reviewing a trial court's denial of remittitur, we note that the court has broad discretion in making its decision. *Botanicals on the Park, Inc. v. Microcode Corp.*, 7 S.W.3d 465, 470 (Mo.App. E.D. 1999). We will not disturb its decision on appeal "absent an abuse of discretion 'so grossly excessive that it shocks the conscience and convinces this court that both the trial judge and the jury have abused their discretion.'" *Id.* (quoting *King v. Unidynamics Corp.*, 943 S.W.2d 262, 268 (Mo.App. E.D.1997)).

■ For punitive damages, an abuse of discretion is established only when the size of the award is manifestly unjust, and "so disproportionate to the relevant factors that it reveals improper motives or a clear absence of the honest exercise of judgment." *Barnett v. La Societe Anonyme Turbomeca France*, 963 S.W.2d 639, 661 (Mo.App. W.D.1997).

## Discussion

### 1. Compensatory Damages

■ Survivair argues that the trial court erred in denying their motion for remittitur because the verdict was grossly excessive based on the evidence. They request a new trial on this point; alternatively, they ask us to remit the compensatory damage verdict.

■ Compensatory damages may be awarded based on the pecuniary losses suffered by reason of the decedent's death, funeral expenses, loss of services, consortium, companionship, and comfort, and the pain and suffering experienced by the decedent because of the defendants' misconduct. § 537.090; *Letz v. Turbomeca Engine Corp.*, 975 S.W.2d 155, 176 (Mo.App. W.D.1997). Pecuniary loss may be shown through evidence of the decedent's health, character, talents, earning capacity, life expectancy, age and habits. *Letz*, 975 S.W.2d at 176. To warrant a new trial, Survivair must not only show us that the verdict was grossly excessive, but they must also show that there was some trial error or misconduct by the prevailing party that was responsible for prejudicing the jury. *See Bodimer v. Ryan's Family Steakhouses, Inc.*, 978 S.W.2d 4, 9 (Mo. App. E.D.1998).

Survivair does not allege trial error here, and therefore we cannot grant a new trial. Further, we disagree with Survivair that the verdict was grossly excessive. Rather than argue that there was insufficient evidence of each of the factors set out above; to make their point, they cite cases in which plaintiffs recovered a maximum of slightly more than $4 million.[7] While comparable verdicts are something to take into account in determining whether damages were excessive, it is not the only factor to

---

7. However, in their reply brief, Survivair admits that there have been at least four wrongful death verdicts exceeding $11 million in Missouri.

take into account. *See Letz*, 975 S.W.2d at 176. Here, Martin was survived by his wife, three children, and mother. The family presented considerable evidence as to the losses suffered by each plaintiff, as they relate to the factors listed above. The trial court did not abuse its discretion when it denied Survivair's request for remittitur. Point denied.

## 2. Remittitur—Damages for Aggravating Circumstances

■ Survivair's sixth point is that the trial court constitutionally erred in refusing to remit the award of damages for aggravating circumstances. The United States Supreme Court has set forth three "guideposts" for use in determining whether a punitive award is unconstitutionally excessive: (1) the degree of reprehensibility of defendant's conduct, (2) whether there is a reasonable relationship between the punitive damages award and the harm that has either occurred or is likely to result from the defendant's conduct, and (3) the difference between this remedy and the civil or criminal penalties authorized or imposed in comparable cases. *Barnett*, 963 S.W.2d at 662 (citing *BMW of N. Am. v. Gore*, 517 U.S. 559, 574–75, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996)).

The first and most important factor is the reprehensibility of Survivair's conduct. *Id.* As stated above, Survivair had received numerous reports from several different fire departments complaining of the exact two defects at issue here: a leaking PASS alarm and a sticking exhalation valve. Survivair's director and other employees admitted that these malfunctions could be dangerous and life-threatening if they happened during a fire. There was further evidence that Survivair not only inadequately responded to reports of defects, but that they attempted to cover them up.

All of this shows Survivair's conduct was unquestionably reprehensible.

The second factor is the ratio of punitive damages to actual or likely harm. Survivair argues that because the ratio here is greater than 1:1, that fact alone makes it unconstitutional. We disagree. The United States Supreme Court has also stated that there is no precise ratio or formula that is unconstitutional. *BMW*, 517 U.S. at 582, 116 S.Ct. 1589. And this court has affirmed a ratio greater than 1:1. *Brady v. Curators of the Univ. of Mo.*, 213 S.W.3d 101, 111 (Mo.App. E.D.2007) (affirming a compensatory/punitive ratio of one to slightly less that five). Here, the ratio is approximately 1:1.25. Given the other factors at play, we do not find this to be an improper ratio.

The third factor requires a comparison to the civil or criminal penalties imposed in similar cases. Survivair makes no mention of what comparable penalties would be. In *Barnett*, the Western District noted that the punitive damage award was "the only real way to deter the conduct." 963 S.W.2d at 666. Here there is a similar situation. There was evidence that Survivair had received multiple reports of malfunction but had not recalled the products or fixed the problems. Without some sort of penalty for this conduct, there is no way to deter it in the future. The combination of these factors convinces us that the punitive damage award was not grossly excessive, thus the trial court did not abuse its discretion in refusing to remit the award. Point denied.

The judgment of the trial court as to Survivair's appeal is affirmed.

### The Family's Cross–Appeal

The family raises one point in its cross-appeal against Martin's mother, Joyce Martin ("Mrs. Martin"). The family disputes the trial court's apportionment of

damages, arguing that the court improperly awarded 12.5% of the verdict to Mrs. Martin and such amount is without precedent in Missouri. The family argues that the result, apportioning less than 50% of the verdict to Martin's surviving spouse, is similarly without precedent. Because we find the trial court's apportionment to Mrs. Martin was not grossly excessive, we affirm.

### Additional Factual Background

At the apportionment hearing after trial, both the family and Mrs. Martin presented evidence as to Martin's relationship with each plaintiff member of his family. There was considerable testimony confirming that Martin had an extremely close relationship with his wife and each of his children, and they depended upon him.

The conflicting testimony surrounds the nature of Martin's relationship with Mrs. Martin. Martin's wife testified that Martin had a strained relationship with his mother, and that actually his mother had cut off their relationship. However, Mrs. Martin offered testimony that she had an extremely close relationship with her son, and actually they met often without the knowledge of the rest of Martin's family. She also testified that she was financially dependent on Martin, though the family disputes this.

The trial court heard all of the detailed evidence concerning the relationships at issue and apportioned the damage award as follows: Martin's spouse, Angela, received 49.5%; each of Martin's three children, 12.5%; Mrs. Martin, 12.5%; and Martin's father, Lonnie Sides, 0.5%.

### Standard of Review

■ The duty to apportion damages in a wrongful death action lies within the sound discretion of the trial court. *Parr v. Parr*, 16 S.W.3d 332, 336 (Mo. banc 2000). We will reverse the award only if it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *Id.* The trial court is not bound by a set minimum amount or percentage, and we will not disturb the award unless it is grossly excessive or inadequate. *Id.* at 336, 337; *see also Farr v. Schoeneman*, 702 S.W.2d 512, 515 (Mo.App. E.D.1985).

### Discussion

■ The family makes essentially one point: that the award here is unprecedented. The family lays out several examples of courts affirming awards to surviving parents of zero to two percent of the judgment. The family uses this to argue that an award of 12.5% is grossly disproportionate and inappropriate. We disagree.

The family has shown us no case *reversing* an award of this size; rather the cases simply affirm awards of lesser value. This is consistent with our standard of review, which grants wide discretion to trial courts to apportion damages. The fact that the family cannot find a case affirming an award of this size does not consequently mean that the trial court abused its discretion in making the award.

The trial court had adequate testimony to consider in accordance with the factors found in § 537.090 for apportioning damages. We find no support for the argument that the award is grossly excessive, and it was within the trial court's reasonable exercise of its discretion to order the apportionment as it did. Point denied.

### Conclusion

The evidence viewed in the light most favorable to submission shows that the family made submissible cases that both the sticking exhalation valve and the failing PASS alarm contributed to causing

Martin's death. The family also offered substantial evidence of aggravating circumstances to allow the jury to consider the question. The trial court did not abuse its discretion in determining that evidence of other malfunctioning face masks and PASS alarms was sufficiently similar to the incidents at issue to be admitted. The trial court did not abuse its discretion in denying Survivair's motions for remittitur of either the compensatory damages or the aggravating circumstances damages, because those awards were not grossly excessive. Finally, the trial court did not abuse its discretion when it allocated those damages among the plaintiffs. We affirm the judgment of the trial court in all respects.

AFFIRMED.

KATHIANNE KNAUP CRANE, P.J., and MARY K. HOFF, J., concur.